[Cite as *State v. Tanner*, 2019-Ohio-1193.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


STATE OF OHIO,                           :

    Appellee,                        :        CASE NO. CA2018-04-088

                                     :        O P I N I O N
- vs -                                            4/1/2019
                                     :

RAYMOND TANNER,                          :

    Appellant.                       :


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR1990-02-0169


Michael T. Gmoser, Butler County Prosecuting Attorney, Willa Concannon, John C. Heinkel, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellee

Cook Howard Law, Ltd., Melynda W. Cook Howard, 1501 First Avenue, Middletown, Ohio 45044, for appellant


**HENDRICKSON, J.**

{¶ 1} Appellant, Raymond Tanner*,* appeals from a decision of the Butler County Court of Common Pleas denying his request to terminate his commitment upon the court's finding that he remains a mentally ill person subject to court order. For the reasons set forth below, we affirm the trial court's decision.

{¶ 2} In February 1990, 33-year-old Tanner decapitated his wife in their Fairfield,

Ohio home. Tanner was arrested and taken to jail. However, due to certain behaviors that he was exhibiting, Tanner was transferred to a mental health forensic unit for treatment and evaluation.

{¶ 3} On March 15, 1990, Tanner was indicted for aggravated murder. On June 21, 1990, following multiple evaluations, Tanner was found not guilty by reason of insanity of aggravated murder and was found to be a mentally ill person subject to court order pursuant to R.C. 2945.40 and 5122.01. Tanner was diagnosed with schizophrenia, paranoid type, and was committed to the Dayton Mental Health Center Forensic Unit for treatment.

{¶ 4} During the first six months he was committed, Tanner was given medication to treat his mental illness. However, within six months, his psychotic symptoms dissipated, and he was taken off his medication. Tanner was last prescribed psychiatric medication in April 1991.

{¶ 5} From 1990 to 1996, Tanner remained committed, although he was transferred to less restrictive facilities. As time went on, Tanner's initial diagnosis of schizophrenia, paranoid type, was changed. Psychiatrists and psychologists evaluating and treating Tanner were unable to agree upon a diagnosis. At different points in time, Tanner was diagnosed with major depressive disorder, single episode severe, with psychotic features; brief psychotic reaction; and schizophreniform disorder.

{¶ 6} In December 1996, after a full hearing on the matter, Tanner was granted conditional release from his institutionalization and was released into the community. Since his release, Tanner has appeared before the trial court every two years for a review of his conditional release status and the conditions of his release. Over the years, the trial court decreased the requirements of Tanner's conditional release but continued to conclude that Tanner remained a mentally ill person subject to court order. From 1998 to 2003, Tanner was required to participate in monthly sessions with a psychologist and to have monthly

meetings with his case manager. In 2004, the court ordered Tanner to have one-hour sessions with a psychologist or psychiatrist every four weeks for six months and then once every six weeks for 18 months. In 2006, the court ordered Tanner to complete eight counseling sessions per year at Advanced Therapeutic Services, Inc. with his counselor, Gene Idol. Then, in 2009, the court decreased the number of counseling sessions Tanner was required to complete with Idol to "bimonthly counseling sessions." Since 2011, the court has required Tanner to meet with Idol at least once every four months.

{¶ 7} As relevant to the present appeal, on November 2, 2017, pursuant to the requirements of R.C. 2945.401(D)(1), Dr. Myron Fridman, the designee of the Department of Mental Health and Addiction, authored and sent to the trial court and local forensic center a report recommending termination of Tanner's commitment. In his report, Fridman stated that it was his opinion, "within a reasonable degree of psychological certainty that Raymond Tanner is no longer a mentally ill individual subject to court ordered treatment." In forming this opinion, Dr. Fridman indicated he had "reviewed the forensic file, interviewed Mr. Tanner for approximately one hour on October 18, 2017, and had a fifteen minute telephone contact with [Tanner's] counselor, Gene Idol."

{¶ 8} Upon receiving Dr. Fridman's report, Dr. Jennifer O'Donnell, the director of forensic services at the Forensic Evaluation Service Center (the local forensic center), evaluated Tanner. Following her evaluation, Dr. O'Donnell sent a report to the trial court and to Dr. Fridman, as designee. In her report, Dr. O'Donnell stated she met with Tanner for approximately 40 minutes on November 29, 2017, completed the Symptom Checklist 90-R (SCL-90-R) with Tanner, looked over a prior forensic evaluation of Tanner she had completed in October 2015, and reviewed the November 14, 2017 referral provided to the forensic center, the November 2, 2017 report prepared by Dr. Fridman, medical records from Tanner's primary care physician, and the forensic center's chart and information relating to all

- 3 -

previous evaluations completed on Tanner. In her written report, Dr. O'Donnell opined that Tanner "does not suffer from severe mental illness nor does he require treatment for a psychiatric condition." Dr. O'Donnell, therefore, agreed with Dr. Fridman's opinion that Tanner should be terminated from conditional release.

{¶ 9} A biannual review hearing of Tanner's status was scheduled to occur in January 2018. However, the state sought a continuance so that it could obtain another evaluation of Tanner's mental condition in accordance with R.C. 2945.401(D)(1)(c). Though the trial court granted the continuance, the state never obtained another opinion. On March 13, 2018, two days before the continued review hearing was set to commence, Tanner, through retained counsel, filed a motion to terminate his commitment pursuant to R.C. 2945.401.

{¶ 10} On March 15, 2018, the trial court held a hearing. The state called Dr. Fridman and Dr. O'Donnell as witnesses and introduced into evidence their respective reports. Dr. O'Donnell's 2015 report was also introduced into evidence.

{¶ 11} Dr. Fridman testified that he has a doctorate in psychology and is the chief clinical officer designee and the forensic monitor for the Butler County Mental Health Addiction Services Recovery Board. He explained that he is not involved in Tanner's treatment but, as the designee forensic monitor, he has evaluated Tanner five times in the last ten years. Prior to his November 2, 2017 report, in his role as forensic monitor, Dr. Fridman had consistently concluded that Tanner was a mentally ill person subject to court order.

{¶ 12} Dr. Fridman testified that since his 2015 evaluation of Tanner, his only contact with Tanner had been a one-hour interview, which occurred on October 18, 2017. Dr. Fridman had received reports from Tanner's counselor, though the reports were "not as frequent as they should be."

{¶ 13} Dr. Fridman testified Tanner had been on conditional release since 1996.

- 4 -

Since his release, neither Fridman nor Tanner's reporting counselor had observed any signs of mental illness. In fact, according to Dr. Fridman, within six months of murdering his wife, Tanner showed no signs of mental illness and, as of April 1991, was no longer taking psychiatric medication.

{¶ 14} Dr. Fridman discussed the history of Tanner's mental illness and noted that numerous psychiatrists and psychologists have been unable to reach an agreement on a diagnosis for Tanner's mental illness. Dr. Fridman explained that Tanner had originally been diagnosed with paranoid schizophrenia. However, subsequent diagnoses have included major depressive disorder, single episode severe, with psychotic features; brief psychotic reaction; and schizophreniform disorder. Additionally, Dr. Fridman noted, it has been "suggested that Mr. Tanner has a personality disorder." Dr. Fridman testified that the diagnosis of major depressive disorder, single episode, severe with psychotic features "appears to best fit Mr. Tanner's symptoms and course of illness" and it has been the "most accepted" diagnosis by the numerous individuals who have evaluated Tanner over the years.

{¶ 15} Dr. Fridman discussed the "series of significant life stressors" that had occurred in Tanner's life around the time that Tanner murdered his wife. Dr. Fridman noted that Tanner's infant daughter had died of sudden infant death syndrome ("SIDS") and her death caused Tanner to become depressed and "increasingly suspicious." Tanner began to believe that his daughter's death had not been an accident and that his wife had somehow been involved. Dr. Fridman opined that Tanner had "misperceive[d] his wife's behaviors in the context of his developing depression and psychosis, suspiciousness, and paranoia."

{¶ 16} Dr. Fridman noted that epidemiological data suggests that "at least 60 percent" of individuals with Tanner's diagnosis can be expected to have a "second episode." When asked what assurances there were that, in the future, stressors in Tanner's life and Tanner's actions would not be repeated, Dr. Fridman responded, "we have 27 years of history" in

which Tanner had not had another episode. Dr Fridman noted that since Tanner was released back into the community in 1996, there have been no significant problems. Tanner has not reoffended or committed any violent crime and there has been no substance abuse, no identified symptoms of mental illness, and no psychiatric symptomatology. According to Dr. Fridman, Tanner has been symptom free of any mental illness since 1996, the entire time he has been on conditional release.

{¶ 17} Dr. Fridman testified about the current terms of Tanner's conditional release, noting that Tanner is required to see Idol, a "social worker," once every three or four months. Dr. Fridman testified that he would not call Tanner's visits with Idol psychotherapy. Rather, Dr. Fridman called it "checking in, you know, [to] see how he's doing. See if he's – if any symptoms are beginning to recur." Tanner's sessions with Idol were scheduled for 50 minutes, however, Dr. Fridman stated he "wouldn't be surprised if sometimes they're shorter than that because they're really not * * * therapy. They're really checking in and seeing how things are going."

{¶ 18} Dr. Fridman testified about Tanner's living arrangements, work life, and familial and social relationships. Dr. Fridman discussed stressors Tanner has experienced since being released in 1996. Tanner lost multiple jobs, his home due to financial struggles, and a long-term girlfriend. Dr. Fridman noted that despite these "life stressors," there had not been any new instances of violence.

{¶ 19} Dr. Fridman acknowledged that after completing an evaluation of Tanner in 2015, he testified at a 2015 review hearing that Tanner remained mentally ill but his mental illness was in remission. In 2015, Dr. Fridman had indicated that "if there were no new changes" with Tanner between 2015 and the two-year reporting period ending in 2017, he intended to conclude that Tanner was no longer mentally ill. When questioned at the 2017 hearing about the difference between a person being "in remission" from mental illness as

opposed to the person being "no longer mentally ill," Dr. Fridman testified that the distinction between the two concepts was "difficult" and "[could] be subjective." He stated,

> I've looked at literature. I looked at cancer literature, for example, and you know, how long is somebody considered to be in remission from cancer and at what point do they say, "well, this is no longer cancer in remission. This is simply no longer having cancer." And there is no definitive time frame. I believe that most mental health professionals would have felt that Mr. Tanner was no longer mentally ill several years ago. My recommendations were always based on the statute requiring that err on the side of public safety. But even erring on the side of public safety, at some point I felt obligated to recommend, give my opinion that Mr. Tanner was simply no longer mentally ill.

Therefore, based upon his education, training, and experience, Dr. Fridman opined to a reasonable degree of psychological certainty that Tanner was no longer mentally ill as defined by R.C. 5122.01 or as defined in Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"). Dr. Fridman, therefore, recommended termination of Tanner's commitment.

{¶ 20} Dr. O'Donnell testified that she has a doctorate in psychology, is a licensed psychologist, and is currently the CEO and forensic director of the Forensic Evaluation Service Center. Dr. O'Donnell explained that she first evaluated Tanner in 2015 and, at that time, formed the opinion that Tanner was no longer a mentally ill person and should not be subjected to hospitalization or court supervision. She stated that her 2015 evaluation of Tanner was "quite extensive" as, in addition to interviewing Tanner and talking to his therapist and other individuals who had evaluated him in years past, Dr. O'Donnell was able to examine "all of the available information from the original offense including all the information at the court * * * * [which] included all the evaluations from pretrial all the way through the finding of insanity and after."

{¶ 21} When she evaluated Tanner in 2017, Dr. O'Donnell met with him for 40 minutes and had him complete the SCL-90-R, a checklist of possible symptoms and the severity of

those symptoms if they had been experienced. Tanner had not experienced any symptoms on the checklist. However, as Dr. O'Donnell admitted, the SCL-90-R is a self-reporting test and "quite often [she] meet[s] people who lie and conceal their symptoms." She further explained that a person's insight into his or her mental illness is used to "determine if a person is going to be compliant with treatment and if they are going to recognize whether they're decompensating or not."

**{¶ 22}** Dr. O'Donnell was unable to offer a diagnosis as to Tanner's original mental illness. She did not agree with Dr. Fridman's diagnosis that Tanner's mental illness was a depressive disorder, single episode, severe with psychotic features. Rather, with respect to Tanner's diagnosis, Dr. O'Donnell testified:

> Well to be honest, I didn't come to a conclusion about what Mr. Tanner's psychosis was caused from at the time of the crime. In fact, I still have a question about whether it was psychosis or not. But that did not – I was focusing more on the symptoms and the actual presence of the symptoms at this time in 2015 and then in 2017.
>
> * * *
>
> Versus his history. * * * I didn't feel that I could reach a conclusion with reasonable psychological certainty about something that happened in 1990 even though there was quite a lot of records. And really because the records were kind of all over the place.

**{¶ 23}** When asked by the state, "If we don't know what caused what happened back in 19[90], how do we know it won't happen again," Dr. O'Donnell testified that she relies on Tanner's past history to stressors in his life. She explained that in her opinion, Tanner is "at a low risk of violence based upon his past * * * ten years of reaction to stressors in his life." Although Dr. O'Donnell admitted she was "not aware of the most, most recent stressors" in Tanner's life, she was able to "explore other stressors in his life," such as the loss of his home, the loss of his job due to court-related press surrounding his case, and his bankruptcy.

Dr. O'Donnell felt Tanner had "responded to those stressful experiences in a fairly appropriate manner without any new criminal convictions, * * * [a]ny alleged criminal activity, or any obvious or documented psychiatric breaks."

{¶ 24} Dr. O'Donnell testified about Tanner's personality disorder diagnosis and noted that a personality disorder does not meet the definition of mental illness. Rather, Dr. O'Donnell explained, one could suffer from a personality disorder and not be mentally ill. In her 2017 written report, Dr. O'Donnell stated the following about Tanner's personality:

> The one factor that has remained and was most often mentioned as troubling across various evaluators, was Mr. Tanner's attitude toward treatment professionals and his unwillingness to engage in treatment. In my opinion this is a function of his personality style, rather than a symptom of a psychiatric illness. That is, it is a function of his disdain for admitting he could benefit from others, or that others could help him gain insight into his actions. He appears to have accepted that there was modest value in this, or at least in the skill set and effort to get insight. However, while outsiders might want him to own his responsibility and declare he has an illness, and express more regret than he has previously, in my opinion, he will never do that. I believe this is an ingrained personality trait for which he sees no reason to change.
>
> Further, there was for a long time the fear that because Mr. Tanner did not acknowledge that he had a severe mental illness, if he were to experience psychiatric decompensation in the future, he would be unlikely to report the early signs to treatment providers, and that could lead to a replay of the violence seen in 1990. There has been no return of any of these symptoms in over 25 years and, there is no reason to suspect that they will return. It is true that were they to return, this individual would be very unlikely to seek out mental health treatment, but hopefully, given the success he had with getting his chronic pain managed, he now sees more value in the treatment community.

{¶ 25} Dr. O'Donnell explained that she could not reach an opinion with reasonable psychological certainty about the difference between being in remission versus a mental illness no longer being present. She explained that "there's no published research about the disappearance, if you will, of a mental illness. It's just not out there." Nonetheless, Dr.

O'Donnell testified to a "reasonable psychological certainty that [Tanner] does not suffer from a severe mental illness nor does he require treatment for a psychiatric condition."  In her opinion, Tanner does not meet the definition of a person suffering from a mental illness, as set forth in either R.C. 5122.01 or the DSM-5.

{¶ 26} After hearing from Dr. Fridman and Dr. O'Donnell, the trial court issued its decision finding clear and convincing evidence that Tanner continues to be a mentally ill person subject to court order.  The trial court therefore denied Tanner's request to terminate his commitment and continued Tanner's conditional release with the requirement that he engage in appointments with Idol at least once every four months.  In rendering its decision, the court noted it had a duty to conduct its own, independent evaluation of the factors set forth under R.C. 2945.401(E) and that it could not "rubber stamp * * * a psychiatrist's or designee's opinions."

{¶ 27} On April 3, 2018, the trial court journalized its findings in an Entry of Review Hearing and an Entry on Request to Terminate Commitment.  Tanner timely appealed from these entries, raising the following as his only assignment of error:

{¶ 28} THE TRIAL COURT ERRED IN FINDING DEFENDANT [TANNER] REMAINED A MENTALLY ILL PERSON SUBJECT TO COURT ORDER.

{¶ 29} In his sole assignment of error, Tanner argues the trial court erred in determining that he remained a mentally ill person subject to court order and the continued jurisdiction of the court.  Tanner contends that his commitment should have been terminated as there was "uncontroverted evidence" that he was no longer a mentally ill person and that his continued commitment violated his due process rights.

{¶ 30} Individuals in Ohio found not guilty by reason of insanity and committed to mental institutions are protected by both the due process clauses of the United States and Ohio Constitutions and by statute under R. C. Chapters 2945 and 5122.  *In re Fisher*, 39

Ohio St.2d 71 (1974); *State v. Rohrer*, 4th Dist. Ross. No. 14CA3471, 2015-Ohio-5333, ¶ 20; *State v. Jung*, 132 Ohio App.3d 369, 372, fn. 1 (6th Dist.1999).  "The involuntary commitment of an individual constitutes a significant deprivation of liberty." *Rohrer* at ¶ 21.  Therefore, "it is particularly important that the statutory scheme be followed, so that the [individual's] due-process rights receive adequate protection." *In re Miller*, 63 Ohio St.3d 99, 101 (1992).

{¶ 31} "The Due Process Clause 'requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.'" *Jones v. United States*, 463 U.S. 354, 368, 103 S.Ct. 3043 (1983), quoting *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845 (1972).  An insanity acquitee "may be held as long as he is both mentally ill and dangerous, but no longer." *Foucha v. Louisiana*, 504 U.S. 71, 77, 112 S.Ct. 1780 (1992).

{¶ 32} Pursuant to R.C. 2945.401, a person found not guilty by reason of insanity and committed pursuant to R.C. 2945.40 remains "subject to the jurisdiction of the trial court pursuant to that commitment * * * until the final termination of the commitment." R.C. 2945.401(A) and (J)(1).  The final termination of a commitment occurs upon the earlier of one of the following:  (1) the trial court determines the defendant is no longer a mentally ill person subject to court order, (2) the maximum term of imprisonment that the defendant could have received if the defendant had been convicted of the most serious offense with which the defendant was found not guilty by reason of insanity has expired, or (3) the trial court enters an order terminating the commitment under division (J)(2)(a)(ii) after finding the defendant competent to stand trial.  R.C. 2945.401(J)(1)(a)-(c).

{¶ 33} Pursuant to R.C. 2945.401(C), six months after the initial commitment, and then every two years thereafter, the department of mental health and addiction services or the institution or facility where the defendant has been committed must file a written report with the trial court indicating "whether the defendant * * * remains a mentally ill person subject to

court order." Within 30 days of receiving the report, the trial court must hold a hearing on the continued commitment of the defendant or on any changes in the conditions of the commitment. *Id.* Under this provision, the defendant is also permitted to seek a change in the conditions of confinement and the trial court is required to conduct a hearing on that request if six months or more have elapsed since the last review hearing. *Id.*

{¶ 34} R.C. 2945.401(D)(1) provides that the designee of the department of mental health and addiction services or the director of the institution or facility that the defendant is committed to may, after evaluating the risks to public safety and the welfare of the defendant, "recommend a termination of the defendant's * * * commitment or a change in the conditions of the defendant's * * * commitment." If the designee recommends termination, the "designee shall send written notice of the recommendation to the trial court and the local forensic center." R.C. 2945.401(D)(1)(b). The local forensic center must then evaluate the defendant and provide a written report to the trial court and the designee. *Id.* "If the department's designee's recommendation is for nonsecured status or termination of commitment, the prosecutor may obtain an independent expert evaluation of the defendant's * * * mental condition." R.C. 2945.401(D)(1)(c).

{¶ 35} Where there has been a recommendation that a defendant's commitment be terminated, "the prosecutor has the burden of proof * * * to show by clear and convincing evidence that the defendant * * * remains a mentally ill person subject to court order." R.C. 2945.401(G)(1). Clear and convincing evidence is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 36} In determining whether to terminate a defendant's commitment, the trial court

shall consider all relevant factors, including but not limited to, all of the following:

> (1) Whether, in the trial court's view, the defendant * * * currently represents a substantial risk of physical harm to the defendant * * * or others;
>
> (2) Psychiatric and medical testimony as to the current mental and physical condition of the defendant * * *;
>
> (3) Whether the defendant * * * has insight into the defendant's * * * condition so that the defendant * * * will continue treatment as prescribed or seek professional assistance as needed;
>
> (4) The grounds upon which the state relies for the proposed commitment;
>
> (5) Any past history that is relevant to establish the defendant's * * * degree of conformity to the laws, rules, regulations, and values of society;
>
> (6) If there is evidence that the defendant's * * * mental illness is in a state of remission, the medically suggested cause and degree of the remission and the probability that the defendant * * * will continue treatment to maintain the remissive state of the defendant's * * * illness should the defendant's * * * commitment conditions be altered.

R.C. 2945.401(E). At the conclusion of a termination hearing or a hearing to change the conditions of the defendant's commitment, "the trial court may approve, disapprove, or modify the recommendation and shall enter an order accordingly." R.C. 2945.401(I).

{¶ 37} As to what constitutes mental illness subject to court order, courts are directed to employ the standards set forth in R.C. Chapter 5122 when those provisions are not in conflict with the criminal code. *See Rohrer*, 2015-Ohio-5333 at ¶ 59; *State v. Werner*, 168 Ohio App.3d 272, 2006-Ohio-3866, ¶ 14 (6th Dist.). "Mental illness" is defined as a "substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life." R.C. 5122.01(A). "Mentally ill person subject to court order" is defined, in relevant part, as a "mentally ill person who, because of the person's illness * * * [r]epresents

- 13 -

a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness." R.C. 5122.01(B)(2).

{¶ 38} Having thoroughly reviewed the record, we find that Tanner's due process rights were not violated and the trial court did not err when it denied Tanner's motion to terminate his commitment. Contrary to Tanner's arguments, the trial court properly considered the factors set forth in R.C. 2945.401(E) and clear and convincing evidence was presented by the state demonstrating Tanner was a mentally ill person subject to court order. Although the only two witnesses who testified on behalf of the state recommended termination of Tanner's commitment, their reasons for supporting termination were undermined at the hearing. Both Dr. Fridman and Dr. O'Donnell had weak as well as strong areas in their testimonies, and the trial court, as the trier of fact, was free to believe all, part, or none of testimony of each witness. *Rohrer* at ¶ 82. Furthermore, "[t]he weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact" as the trial court was in the best position to view the witnesses, observe their demeanor, gestures and voice inflections, and use said observations in weighing the credibility of the proffered testimony. *Id.*[1]

{¶ 39} As required by R.C. 2945.401(E)(2), the trial court considered the psychiatric testimony as to Tanner's current mental and physical condition. However, in doing so, the

---

1. The state was not required to produce a witness to opine that Tanner remained a mentally ill person subject to court order. Although the state had the option of seeking an independent evaluation of Tanner's mental condition pursuant to R.C. 2945.401(D)(1)(c), the state was entitled to rely on its examination of Dr. Fridman's and Dr. O'Donnell's evaluations of Tanner to establish that Tanner remained a mentally ill person subject to court order. *See, e.g., State v. Ansley*, 12th Dist. Butler No. CA2005-07-182, 2006-Ohio-1149 (finding the trial court did not err when it disagreed with two psychiatrists' opinions that the defendant was ready for a less restrictive setting, as the state's examination of the experts demonstrated the proposed change was a threat to public safety); *State v. Hubbard*, 11th Dist. Trumbull No. 2013-T-0082, 2014-Ohio-4130 (finding the trial court did not err when it disagreed with the only witness's testimony that the defendant's commitment should be moved to a less restrictive status, as the state demonstrated through its examination of the witness that the defendant concealed his actual mental condition and his compliance was not an indication of progress, but rather a desire for greater freedom).

trial court noted it had a duty to "go past the cursory opinions [of Dr. Fridman and Dr. O'Donnell] and examine the testimony and reports to a further degree." The court discussed the fact that while both experts had rejected Tanner's original diagnosis of paranoid schizophrenia, they were unable to agree on a diagnosis for Tanner. Dr. Fridman diagnosed Tanner with a major depressive disorder, single episode, severe with psychotic features. Dr. O'Donnell disagreed with this diagnosis, and with all other offered diagnoses offered over the years. She stated that she was unable to come to a conclusion about Tanner's psychosis at the time of the 1990 murder.

{¶ 40} Despite the fact that Dr. O'Donnell did not have an opinion as to what mental illness Tanner suffered from at the time of the 1990 murder, she nonetheless believed Tanner was no longer mentally ill and posed a "low risk" for violence because he had responded appropriately to stressors during the last ten years of his life. In reaching this determination, Dr. O'Donnell relied on Tanner's answers to the SCL-90-R, a test in which Tanner was asked to self-report any symptoms or signs of psychosis. Although the trial court acknowledged that the SCL-90-R is an "acceptable [tool] within the psychological field," the trial court was nonetheless concerned by the fact that "the conclusions that are reached by the psychologist * * * are based on a * * * conversation every two years or a 40-minute interview by Dr. O'Donnell this past year." The trial court's concern with relying on Dr. O'Donnell's conclusion appears to be further justified by the fact that Dr. O'Donnell admitted she was "not aware of the most, most recent stressors" in Tanner's life, such as the death of his sister and brother-in-law. Dr. O'Donnell further testified that in compiling her 2017 report, she had not contacted Tanner's family members, as she had done when completing her report and evaluation of Tanner in 2015.

{¶ 41} In his testimony, Dr. Fridman agreed that Tanner had responded appropriately to stressors in his life over the years. However, Dr. Fridman stated that epidemiological data

- 15 -

indicated that at least 60 percent of those individuals diagnosed with a major depressive disorder, single episode, severe with psychotic features, are expected to have a "second episode" in their lifetime.

{¶ 42} Regarding Dr. Fridman's opinion that Tanner was no longer mentally ill, the trial court noted that it was troubled by the fact that Dr. Fridman's 2017 report was "almost virtually identical" to the report Dr. Fridman submitted in 2015. The court noted that Dr. Fridman had evaluated Tanner five times over the course of ten years, and in all evaluations prior to 2017 – including in 2015 – Dr. Fridman had concluded Tanner remained a mentally ill person subject to court order. As the court noted, the only difference between circumstances in 2015 and 2017, besides the passage of time, was Dr. Fridman's 2015 promise to Tanner that he would conclude Tanner was no longer mentally ill in 2017 "if there were no new changes" with Tanner between 2015 and 2017.[2] As a result of Dr. Fridman's promise and the similarities between the 2015 and 2017 reports, the trial court indicated it was giving "little weight to the conclusions that are offered by the psychologist."

{¶ 43} Turning to the other factors set forth in R.C. 2945.401(E), the trial court noted that Tanner has consistently shown that he lacks insight into his condition and would be unlikely to seek professional assistance as needed. Over the years, Tanner has questioned

2. The trial court was very troubled by the similarity between Dr. Fridman's 2015 and 2017 reports. At the June 4, 2018 hearing, the trial court stated it "went back and line by line underlined and read what was in the 2015 report and I did not underline what is new to the 2017 report and it's pretty clear that the report is virtually identical." The court further stated that

> [w]hat is missing in the 2017 report is something that was in the 2015 report. The last paragraph in particular where Dr. Fridman indicated that he had discussed his prior recommendation with Mr. Tanner. He said he – "Mr. Tanner said he understood the factors involved in making his recommendation and accepted the recommendation. He indicated that he would not contest the recommendation and request another evaluation. He stated that seeing Mr. Idol was not a burden. However, Mr. Tanner expressed the desire to have his conditional release terminated in recognition of his years of being a law-abiding person with no signs of symptoms of mental illness. We discussed this, and I informed Mr. Tanner that if he continued to do well as he has been doing for the last many years I will make the recommendation that he is no longer a

whether he suffered from a mental illness or whether the "incident" could have been caused by "steroid rage," as he claimed to have taken a large steroid injection shortly before decapitating his wife. In her 2017 report, Dr. O'Donnell noted that Tanner has a negative attitude toward psychologists and mental health counselors and has shown an unwillingness to engage in treatment. Although Dr. O'Donnell believes Tanner's disdain for treatment and mental health providers is a function of his personality disorder, Dr. O'Donnell acknowledged that should Tanner experience psychiatric decompensation he would be "very unlikely to seek out mental health treatment." Dr. O'Donnell's conclusion is consistent with previous evaluator's reports. As the trial court noted, in 2006, Dr. Steven Sparks concluded Tanner's "personality interfered with his ability to engage in treatment." In 2003, Dr. Sherry Baker, Dr. E. Longo, and Dr. Nancy Schmidtgoessling opined that Tanner's "lack of insight, negative attitudes towards social agencies and institutions, anger and sense of being victimized and unnecessarily prosecuted" were issues that impacted his treatment.

{¶ 44} Tanner contends the trial court erred by considering testimony and reports entered into evidence at prior commitment review hearings. He believes the court was limited to considering only the testimony and exhibits presented at the March 15, 2018 hearing. However, as the supreme court has recognized, in determining whether an individual is a mentally ill person subject to court order, a "totality of the circumstances" test should be used. *In re Burton*, 11 Ohio St.3d 147, 149 (1984). One of the factors that the court should consider is the individual's past history, so that the court can make a well-informed determination of the individual's present mental condition. *Id.* Additionally, R.C. 2945.401(E)(5) requires the trial court to consider "[a]ny past history that is relevant to establish the defendant's * * * degree of conformity to the laws, rules, regulations, and values

mentally ill individual subject to court order at the 2017 conditional release review hearing."

of society. The trial court, therefore, did not err when it considered the entire history of Tanner's case, including his biannual mental health evaluations. This is especially true where both Dr. O'Donnell and Dr. Fridman referenced prior evaluations they and other psychologists had conducted over the years in forming their respective opinions.

{¶ 45} Furthermore, with respect to Tanner's history for conforming to the rules of law, the trial court noted that Dr. O'Donnell's report indicated Tanner had been violent with both of his wives. During his first marriage, Tanner had a physically aggressive relationship with his wife and he admitted to "smacking" her. Tanner then brutally decapitated his second wife. With respect to the latter offense, Tanner's mental illness "was thought to have come on rather quickly without much in the way of warning." Dr. O'Donnell felt that Tanner's family would be helpful in ensuring that Tanner sought assistance if symptoms reappeared, noting that when she spoke to them in 2015, Tanner's family had stated they were "mindful of * * * Tanner's possibility of experiencing another psychiatric break, so they watch for the early signs of depression or bizarre thinking and have a plan to get him into treatment at the first sign." However, the trial court questioned whether Tanner's family would be helpful if Tanner's symptoms recurred, noting that Dr. O'Donnell's 2015 report indicated Tanner's family had been "aware of Tanner's decompensation (paranoia, depression and irritability)" in 1990, but had not taken action to address it. This is particularly concerning, as Dr. O'Donnell agreed that if Tanner's symptoms occurred, he was "very unlikely to seek out mental treatment" on his own volition.

{¶ 46} As for whether Tanner was in remission and would continue treatment to maintain the remissive state if his commitment conditions were altered, the trial court noted that it "struggle[d] greatly" with whether or not Tanner could be in remission from a disease that the experts struggled to diagnose. Nonetheless, relying on Dr. Fridman's and Dr. O'Donnell's testimony, the trial court stated that "there is zero probability that * * * [Tanner]

would seek or maintain treatment if the Court terminated the commitment in this case and the Court does not believe that he would seek treatment if it became necessary."

{¶ 47} Finally, with respect to R.C. 2945.401(E)(1), the trial court held that in its view, Tanner currently represents a substantial risk of physical harm to others. In reaching this conclusion, the court noted that for the first 33 years of his life, Tanner had not experienced any symptoms of mental illness. Yet, in 1990, after a "rapid onset of symptoms," Tanner committed a brutal crime and murdered his wife. Given the quickness with which the psychotic symptoms appeared, the fact that there existed at least a 60 percent chance of another episode occurring during Tanner's lifetime, Tanner's lack of insight into his illness, and his disdain for mental health treatment, there was evidence to support the trial court's finding that Tanner represents a substantial risk of harm to others.

{¶ 48} Accordingly, after considering the evidence submitted at the hearing, the history of Tanner's illness and treatment, and the factors set forth in R.C. 2945.401(E), we find that Tanner's due process rights were not violated and that the trial court did not err in denying Tanner's motion to terminate his commitment. Through its examination of the witnesses, the state demonstrated that Tanner remains a mentally ill person subject to court order. The trial court's decision to continue Tanner's conditional release, with the requirement that Tanner see his counselor once every four months, was supported by the record. Tanner's sole assignment of error is, therefore, overruled.

{¶ 49} Judgment affirmed.

S. POWELL, P.J., and RINGLAND, J., concur.