[Cite as *State v. Tanner*, 2022-Ohio-4224.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | CASE NO. CA2021-12-167 |
| Appellee, | : | O P I N I O N<br>11/28/2022 |
| | : | |
| - vs - | : | |
| | : | |
| RAYMOND TANNER, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR 1990 02 0169

Michael T. Gmoser, Butler County Prosecuting Attorney, and Stephen M. Wagner, Assistant Prosecuting Attorney, for appellee.

Law Office of John H. Forg, and John H. Forg, III, for appellant.

**M. POWELL, P.J.**

{¶ 1} Appellant, Raymond Tanner, appeals a decision of the Butler County Court of Common Pleas denying his request to terminate his commitment upon the court's finding he remains a mentally ill person subject to court order.

{¶ 2} On February 14, 1990, Tanner decapitated his wife in their Fairfield, Ohio home. In June 1990, Tanner was found not guilty by reason of insanity, was diagnosed

with schizophrenia, paranoid type, was found to be a mentally ill person subject to court order pursuant to R.C. 2945.40 and 5122.01, and was committed to the Dayton Mental Health Center Forensic Unit for treatment.

{¶ 3} During the first six months he was committed, Tanner was given medication to treat his mental illness. However, within six months, his psychotic symptoms dissipated, and he was taken off his medication. Tanner was last prescribed psychiatric medication in April 1991.

{¶ 4} From 1990 to 1996, Tanner remained committed, although he was transferred to less restrictive facilities. As time went on, Tanner's initial diagnosis of schizophrenia, paranoid type, was changed. Psychiatrists and psychologists evaluating and treating Tanner were unable to agree upon a diagnosis. At different points in time, Tanner was diagnosed with major depressive disorder, single episode, severe with psychotic features; brief psychotic reaction; and schizophreniform disorder. The diagnosis of major depressive disorder, single episode, severe with psychotic features was first offered in 1996 and has since been the most accepted diagnosis by numerous evaluators.

{¶ 5} In December 1996, after a full hearing on the matter, Tanner was granted conditional release from his institutionalization and was released into the community. Since his release, Tanner has appeared before the trial court every two years for a review of his conditional release status and the conditions of his release. Over the years, the trial court has decreased the requirements of Tanner's conditional release but continued to conclude that Tanner remained a mentally ill person subject to court order. From 1998 to 2003, Tanner was required to participate in monthly sessions with a psychologist and have monthly meetings with his case manager. In 2004, the court ordered Tanner to have one-hour sessions with a psychologist or psychiatrist every four weeks for six months and then once every six weeks for 18 months. In 2006, the court ordered Tanner to complete eight

counseling sessions per year at Advanced Therapeutic Services, Inc. with his counselor, Gene Idol. Then, in 2009, the court decreased the number of counseling sessions Tanner was required to complete with Idol to "bimonthly counseling sessions." Since 2011, the court has required Tanner to meet with Idol at least once every four months.

{¶ 6} In March 2018, the trial court conducted a biennial review hearing of Tanner's status. The state called Dr. Myron Fridman and Dr. Jennifer O'Donnell as witnesses and introduced into evidence their respective 2017 reports. Dr. Fridman was and is the designee of the Department of Mental Health and Addiction and the forensic monitor for the Butler County Mental Health Board; Dr. O'Donnell was and is the director of forensic services at the Forensic Evaluation Service Center (the local forensic center). On April 3, 2018, the trial court issued a decision finding clear and convincing evidence that Tanner continued to be a mentally ill person subject to court order. The trial court therefore denied Tanner's request to terminate his commitment and continued Tanner's conditional release with the requirement that he engage in appointments with Idol at least once every four months. We upheld the trial court's decision on April 1, 2019. *State v. Tanner*, 12th Dist. Butler No. CA2018-04-088, 2019-Ohio-1193.

{¶ 7} As relevant to the present appeal, on February 19, 2020, pursuant to the requirements of R.C. 2945.401(D)(1), Dr. Fridman authored and sent to the trial court and local forensic center a report recommending termination of Tanner's commitment. In his report, Fridman stated it was his opinion, "within a reasonable degree of psychological certainty that Raymond Tanner is no longer a mentally ill individual subject to court ordered treatment." In forming this opinion, Dr. Fridman indicated he had "reviewed the forensic file and conditional release reports from Mr. Tanner's current counselor [Idol] and interviewed Mr. Tanner for approximately one and a half hours on February 18, 2020."

{¶ 8} Upon receiving Dr. Fridman's report, Dr. O'Donnell evaluated Tanner via

video conferencing, and then sent a report to the trial court and to Dr. Fridman, as designee. In her report, Dr. O'Donnell stated she interviewed Tanner for approximately 50 minutes on May 12, 2021, completed the Symptom Checklist 90-R ("SCL-90-R") with Tanner, administered the HCR-20 version 3 ("HCR-20 v3") violence risk assessment test, reviewed the prior forensic evaluations of Tanner she had completed in October 2015 and December 2017, and reviewed the March 16, 2020 referral provided to the forensic center and the November 2, 2017 report prepared by Dr. Fridman. In her report, Dr. O'Donnell opined that Tanner "does not suffer from a severe mental illness or mental defect." Dr. O'Donnell, therefore, agreed with Dr. Fridman's opinion that Tanner's commitment should be terminated.

{¶ 9} Tanner moved the trial court to retain Dr Terrance Kukor, a forensic psychologist, to conduct an independent analysis on the court's behalf. Dr. Kukor interviewed Tanner via video conferencing for approximately two and one-half hours on April 25, 2021, completed the psychological testing on May 5, 2021, and sent a report to the trial court. In his report, Dr. Kukor stated he had reviewed all of Tanner's previous evaluations, including the respective 2015, 2017, and 2020 reports from Drs. Fridman and O'Donnell, as well as the HCR-20 v3 test previously administered. Dr. Kukor also had a 45-minute telephone conversation with Dr. Fridman, a 30-minute telephone conversation with Idol, and separate telephone conversation with Tanner's daughter and Tanner's brother and two sisters.

{¶ 10} In his report, Dr. Kukor opined that Tanner's "current mental condition was intact, with no present signs of mental illness [or] personality disorder," that Tanner "manifested insight into his condition so that he will seek professional assistance as needed," and that Tanner's "mental illness [is] in a state of remission, and there is a high probability that he will continue to maintain this remissive state should the commitment

conditions be altered."

{¶ 11} The trial court conducted a biennial review hearing on October 5, 2021, and October 18, 2021. The state called Drs. Fridman and O'Donnell as witnesses and introduced into evidence their respective 2020 reports. Dr. Fridman's 2015 report was also introduced into evidence. Dr. Kukor testified on behalf of Tanner; his 2021 report was introduced into evidence. Drs. O'Donnell, Fridman, and Kukor are all licensed psychologists.

{¶ 12} Dr. O'Donnell testified she had previously evaluated Tanner in 2015 and 2017 and both times, formed the opinion that Tanner was no longer a mentally ill person and should not be subject to hospitalization or court supervision. Dr. O'Donnell again evaluated Tanner in May 2020 for the 2021 biennial review. Dr. O'Donnell stated that Tanner was less defensive during his 2017 evaluation and even less so during his 2020 evaluation, in part because he had read her previous reports and agreed with many of Dr. O'Donnell's statements and observations. Dr. O'Donnell described Tanner as a very opiniated person who "has a sense of the world is out to get him. That's always been his view, his life view in response to me," and who is frank about his belief "he's been treated unjustly by the legal system."

{¶ 13} Dr. O'Donnell recognized that Tanner has a history of defying the trial court's order to engage in treatment and is unlikely to voluntarily engage in any form of treatment. Although she believed that Tanner's family would recognize any deterioration in his condition, she acknowledged that Tanner's family was aware of his decompensation in 1990 and did not take action to address it. Dr. O'Donnell stated she had not talked to Tanner's siblings and daughter for the 2021 biennial review.

{¶ 14} As she did in 2017, O'Donnell reported that Tanner has recently expressed the value of periodic therapy sessions and his current court-ordered sessions with Idol, his

counselor: "Now, he appears to have accepted that there was a modest value in treatment or at least in the relationship that a therapeutic relationship can offer," and he "appreciates being able to talk with Gene Idol." Dr. O'Donnell also reported that while Tanner still does not acknowledge that he ever had a severe mental illness, he also expressed that he would likely report signs of decompensation to Idol and Dr. Fridman. As he has done over the years, Tanner once again questioned whether a large steroid injection and stress over the death of the couple's infant child caused him to decapitate his wife.

{¶ 15} During her 2020 evaluation, Dr. O'Donnell had Tanner complete the SCL-90-R, a self-report checklist of possible symptoms and the severity of those symptoms if they had been experienced. Tanner had not experienced any symptoms on the checklist. Dr. O'Donnell also administered the HCR-20 v3 which assesses the risk of violence for individuals who have been psychiatrically hospitalized and who have been violent previously. The results of that test indicated that Tanner was at a low risk for future violence.

{¶ 16} Dr. O'Donnell was unwilling to offer a diagnosis for Tanner at the time of the offense or what precipitated Tanner to commit the offense. Dr. O'Donnell did not agree that Tanner's offense was consistent with a diagnosis of major depressive disorder, single episode, severe with psychotic features, and instead believed that Tanner suffered from a personality disorder. In fact, Dr. O'Donnell struggled with whether Tanner was ever a severely mentally ill person. Dr. O'Donnell noted that Tanner's personality disorder had mellowed and that "even the expression of that is no longer creating disruptive episodes of conflict or thwarting of authority." Dr. O'Donnell testified that Tanner was in remission of an unspecified mental illness, that his sessions with Idol, which she described as "two old friends getting together for a cuppa," were not the cause of Tanner's remission, and that Tanner was not currently suffering from a severe mental illness or mental defect and that his conditional release commitment should be terminated.

{¶ 17} Dr. Fridman explained that he was not involved in Tanner's treatment but that, as the designee forensic monitor, he had evaluated Tanner six times in the last 12 years. Until his 2017 report, in his role as forensic monitor, Dr. Fridman had consistently concluded that Tanner was a mentally ill person subject to court order. Dr. Fridman stated he receives a brief report from Idol once every four months and described Tanner's quarterly 30-to-60-minute meetings with Idol as a "checking in" that gives Idol some opportunity to see how Tanner is functioning. Since Tanner's 1996 conditional release, neither Dr. Fridman nor Idol have observed any signs of mental illness.

{¶ 18} Dr. Fridman testified about Tanner's living arrangements, work life, and familial and social relationships. He stated that Tanner had experienced stressors since being released in 1996, such as the loss of jobs, his home, a long-term girlfriend, and a sibling, but that despite these life stressors, there had not been any new instances of violence. Dr. Fridman stated he has not talked to Tanner's former girlfriend or his siblings and daughter.

{¶ 19} Dr. Fridman disagreed with Dr. O'Donnell's opinion that Tanner suffered from a personality disorder. Rather, Dr. Fridman testified that a diagnosis of major depressive disorder, single-episode, severe with psychotic features was most appropriate based upon Tanner's symptoms and course of illness. As he did in 2015 and 2017, Dr. Fridman stated that epidemiological data indicates that 60 percent of individuals with major depressive disorder, single episode can be expected to have a second episode.

{¶ 20} Dr. Fridman testified that Tanner has long believed his commitment should be terminated because he is no longer a mentally ill person in need of court supervision. Dr. Fridman noted that Tanner's demeanor and cooperation with evaluators have improved over the years and that Tanner holds some evaluators, such as Dr. Kukor, "in high regard. Probably the ones that recommend the way he had hoped they would." Dr. Fridman

assumed Tanner has read his reports. Dr. Fridman testified that Tanner characterized his murder of his wife as "horrendous" and "barbaric" but wondered if "steroid rage" had contributed to the offense "because he had a large steroid injection in his back shortly before the offense."

{¶ 21} In recommending termination of Tanner's commitment, Dr. Fridman testified that Tanner was not only in remission from a severe mental illness, but he was also simply no longer mentally ill: "Mr. Tanner has now been symptom free with no medicine for [29] years. It is no longer tenable to consider him in remission versus to be no longer mentally ill. No definition of mental illness exists that can be applied to Mr. Tanner that would find him to be mentally ill."

{¶ 22} During his evaluation of Tanner, Dr. Kukor administered the Personality Assessment Inventory ("PAI"), a "self-report inventory" that "measure[s] major symptoms of psychopathology, personality characteristics, and behavioral proclivities." The PAI revealed that Tanner had "a tendency to not acknowledge common faults," which Dr. Kukor characterized as defensiveness, and that Tanner "did tend to respond in a manner so as to portray himself as relatively free of common shortcomings that most individuals acknowledge." Although Tanner's defensiveness "could suggest some need[ed] caution about the accuracy of self-disclosure," Dr. Kukor "was not persuaded by this possibility." Dr. Kukor stated that regarding violence risk, Tanner "responded to test items consistent with someone who has reasonable control over the expression of anger and hostility."

{¶ 23} Dr. Kukor reported that the results of the HCR-20 v3 indicate Tanner is at a low risk of violence, the lowest interpretive risk category. In analyzing the results of the test, Dr. Kukor noted that Tanner "readily accepts that he was experiencing acute symptoms of psychosis at the time of the offense," wonders whether the offense "may have been brought about by steroid-induced psychosis," "does not see himself as having a mental illness at

the present time," and would seek out help if he had any symptoms of mental illness. Dr. Kukor recognized the "records of friction" between Tanner and mental health professionals but opined the friction was "driven by interpersonal differences rather than symptomatic impairment."

{¶ 24} Dr. Kukor noted that insight is important when looking at the risk factors of a person for violence. Although Dr. Kukor acknowledged that Tanner may lack insight into his condition, he observed that Tanner is doing the things expected of a person with insight. Dr. Kukor also noted that "[i]n terms of violence risk, the single best predictor of future behavior is past behavior." Dr. Kukor stated that although "the severity and shocking nature of the violence exhibited" during the offense was "an obvious source of concern," Tanner had not displayed overt symptoms of mental illness and had not been violent for 30 years, which "bode[d] well from a risk assessment perspective." Unlike Drs. Fridman and O'Donnell, Dr. Kukor talked to Tanner's siblings and daughter. Tanner's relatives reported they had not observed any signs of concerning behavior in Tanner, including after the relatively recent deaths of two siblings, and they all indicated they would seek help should a concerning behavior emerge.

{¶ 25} Dr. Kukor disagreed with Dr. O'Donnell's diagnosis of personality disorder. Rather, Dr. Kukor testified that the most accurate diagnosis for Tanner was major depressive disorder, single-episode, severe with psychotic features in full remission. Dr. Kukor testified that about 50 percent of people affected by major depressive disorder, single episode, will have recurrent illness and that persons prone to recurrent illness will have around five lifetime episodes. Dr. Kukor was unable to attribute the reasons for the remission of Tanner's mental illness: "I'm afraid it is an unanswerable question. I think there's substantial recent agreement that he's in remission, but I don't know that there's any consensus, or even a good idea, frankly, about what accounts for it. We just don't know."

Dr. Kukor believed that the 30-year period that Tanner has been free of overt symptoms to be determinative and testified there was no longer a reason to continue Tanner's court-ordered conditional release.

{¶ 26} During his testimony, Dr. Kukor consistently referred to Tanner's offense as the "index offense." When the prosecutor asked Dr. Kukor why he did not refer to the offense as "murder," Tanner had an outburst and angrily stated, "I'm not on trial," thereby disrupting the proceedings.

{¶ 27} On November 30, 2021, the trial court issued a decision finding clear and convincing evidence that Tanner remains a mentally ill person subject to court order. The trial court therefore denied Tanner's request to terminate his commitment and continued his conditional release with the requirement that he engage in appointments with Idol once every four months. In reaching its decision, the trial court considered the testimony and 2020 reports from Drs. Fridman and O'Donnell, the testimony and 2021 report of Dr. Kukor, Dr. Fridman's 2015 report, and "'the entire history of Tanner's case' including testimony and reports entered into evidence at prior commitment review hearings," as allowed under R.C. 2945.401. *See Tanner*, 2019-Ohio-1193 at ¶ 26. The trial court also considered Tanner's angry outburst during Dr. Kukor's cross-examination. The court found that Tanner's "disturbing and erratic behavior" was evidence of his lack of insight into his illness and reminiscent of prior evaluations during which Tanner referred to the offense as an incident or mishap, did not feel particularly guilty about the offense, and instead was irritated he had to go through court hearings because this was over and done.

{¶ 28} Tanner now appeals the trial court's decision, raising one assignment of error:

{¶ 29} THE TRIAL COURT ERRED IN FINDING THAT APPELLANT RAYMOND TANNER REMAINED MENTALLY ILL AND SUBJECT TO COURT ORDER.

{¶ 30} Tanner argues the trial court erred in determining he remains a mentally ill

person subject to the continued jurisdiction of the court in light of the three psychologists' opinions he is not mentally ill. Tanner contends that his commitment should have been terminated because there is "absolutely no evidence supporting the trial court's conclusion" and his continued commitment violates his due process rights.

{¶ 31} Individuals in Ohio found not guilty by reason of insanity and committed to mental-health institutions are protected by both the due process clauses of the United States and Ohio Constitutions and by statute under R. C. Chapters 2945 and 5122. *See In re Fisher*, 39 Ohio St.2d 71 (1974); *Tanner*, 2019-Ohio-1193 at ¶ 30. "The involuntary commitment of an individual constitutes a significant deprivation of liberty." *State v. Rohrer*, 4th Dist. Ross No. 14CA3471, 2015-Ohio-5333, ¶ 21. Therefore, "it is particularly important that the statutory scheme be followed, so that the [individual's] due-process rights receive adequate protection." *In re Miller*, 63 Ohio St.3d 99, 101 (1992).

{¶ 32} "The Due Process Clause 'requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.'" *Jones v. United States*, 463 U.S. 354, 368, 103 S.Ct. 3043 (1983), quoting *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S.Ct. 1845 (1972). An insanity acquitee "may be held as long as he is both mentally ill and dangerous, but no longer." *Foucha v. Louisiana*, 504 U.S. 71, 77, 112 S.Ct. 1780 (1992).

{¶ 33} R.C. 2945.401 provides a comprehensive scheme that gives Ohio's trial courts continuing jurisdiction over the commitment conditions of persons committed to mental-health institutions by court order. R.C. 2945.401(A) and (J)(1) provide that if a defendant in a criminal case is found not guilty by reason of insanity and is then committed to a mental-health institution, the defendant shall remain subject to the jurisdiction of the trial court until final termination of the commitment, which occurs through either early termination of the commitment by the trial court or the expiration of the maximum prison

term that could have been imposed if the person had been convicted of the most serious offense charged. *State v. Stutler*, Slip Opinion No. 2022-Ohio-2792, ¶ 10. As pertinent here, the final termination of a commitment occurs when the trial court determines the defendant is no longer a mentally ill person subject to court order. R.C. 2945.401(J)(1)(a).

{¶ 34} The statute requires that the institution at which the defendant has been committed provide a written report to the trial court on the defendant's treatment progress after the first six months of treatment and every two years thereafter. R.C. 2945.401(C). Within 30 days of receiving the report, the trial court must hold a hearing on the continued commitment of the defendant or on any requested changes in the conditions of the defendant's commitment. *Id.*

{¶ 35} At any time after evaluating the risk to public safety and the welfare of the committed defendant, the designee of the department of health and addiction services or the director of the institution or facility where the defendant is committed may recommend to the trial court that the defendant's commitment be terminated or that the conditions of the defendant's commitment be changed. R.C. 2945.401(D). If the designee recommends termination, the "designee shall send written notice of the recommendation to the trial court and the local forensic center." R.C. 2945.401(D)(1)(b). The local forensic center must then evaluate the defendant and provide a written report to the trial court and the designee. *Id.*

{¶ 36} R.C. 2945.401(E) outlines various factors that a trial court must consider when ruling on a recommendation that a committed defendant be granted "nonsecured status or termination of commitment." In addition to any other relevant factors, R.C. 2945.401(E) states that the trial court must consider:

> (1) Whether, in the trial court's view, the defendant or person currently represents a substantial risk of physical harm to the defendant or person or others;
>
> (2) Psychiatric and medical testimony as to the current mental

and physical condition of the defendant or person;

(3) Whether the defendant or person has insight into the defendant's or person's condition so that the defendant or person will continue treatment as prescribed or seek professional assistance as needed;

(4) The grounds upon which the state relies for the proposed commitment;

(5) Any past history that is relevant to establish the defendant's or person's degree of conformity to the laws, rules, regulations, and values of society; [and]

(6) If there is evidence that the defendant's or person's mental illness is in a state of remission, the medically suggested cause and degree of the remission and the probability that the defendant or person will continue treatment to maintain the remissive state of the defendant's or person's illness should the defendant's or person's commitment conditions be altered.

{¶ 37} R.C. 2945.401(E) does not mandate findings on the factors. *State v. Henderson*, 5th Dist. Fairfield No. 16-CA-23, 2017-Ohio-2620, ¶ 29. A trial court is not limited to consider only the six factors above and may consider any other matter brought to the court's attention. *Id.*; *In re Burton*, 11 Ohio St.3d 147, 150 (1984); *State v. Bowen*, 139 Ohio App.3d 41, 45 (1st Dist.2000).

{¶ 38} The prosecutor is charged with representing the state or the public interest at a hearing on an institution's recommendation to terminate a defendant's commitment. R.C. 2945.401(H). Where there has been a recommendation that a defendant's commitment be terminated, the prosecutor bears the burden of proving by clear and convincing evidence that the defendant remains a mentally ill person subject to court order. R.C. 2945.401(G)(1). Clear and convincing evidence is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."

*Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. At the conclusion of a termination hearing or a hearing to change the defendant's commitment conditions, "the trial court may approve, disapprove, or modify the recommendation and shall enter an order accordingly." R.C. 2945.401(I).

{¶ 39} As to what constitutes mental illness subject to court order, courts are directed to employ the standards set forth in R.C. Chapter 5122 when those provisions are not in conflict with the criminal code. *Tanner*, 2019-Ohio-1193 at ¶ 37. "Mental illness" is defined as a "substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life." R.C. 5122.01(A). "Mentally ill person subject to court order" is defined, in relevant part, as a "mentally ill person who, because of the person's illness * * * [r]epresents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness." R.C. 5122.01(B)(2). "A person's mental condition may meet the statutory definition of 'mental illness' provided in R.C. 5122.01(A), regardless of whether his or her condition meets the clinical definition of mental illness." *State v. Sullivan*, 90 Ohio St.3d 502, 509, 2001-Ohio-6, fn. 4.

{¶ 40} Upon thoroughly reviewing the record, we find that Tanner's due process rights were not violated and that the trial court did not err in denying Tanner's request to terminate his commitment. The trial court properly considered the factors set forth in R.C. 2945.401(E) and clear and convincing evidence was presented by the state demonstrating that Tanner remains a mentally ill person subject to court order.

{¶ 41} With respect to R.C. 2945.401(E)(1), the trial court held that Tanner currently represents a substantial risk of physical harm to others. In reaching this conclusion, the

court stated that little has changed since the 2018 biennial review hearing in that in her 2020 report, Dr. O'Donnell noted Tanner's refusal to acknowledge he ever had a severe mental illness, his history of defying the court's order to engage in treatment, and his unlikely voluntariness to engage in any form of treatment. The trial court further noted Drs. Fridman's and Kukor's assessment that 50 to 60 percent of individuals with major depressive disorder, single episode can be expected to have more such episodes. Finally, the court considered Tanner's angry outburst during the October 2021 review hearing and found that Tanner's "disturbing and erratic behavior" was further evidence of his lack of insight into his mental illness.

{¶ 42} With regard to Tanner's current mental and physical condition under R.C. 2945.401(E)(2), the trial court found that given the inconsistent psychiatric and medical testimony as to Tanner's current and past mental condition, the fact that Drs. O'Donnell, Fridman, and Kukor are unable to agree on a diagnosis for Tanner, Dr. O'Donnell's uncertainty as to whether Tanner ever suffered from a mental illness, and the 50-60 percent recurrence epidemiological data referred above, "there is no credible explanation as to why Tanner acted with such extreme violence in 1990. The evidence before the Court does not persuade the Court that Tanner does not fall in the category of 50-60% of people that will have another 'episode.'"

{¶ 43} With respect to R.C. 2945.401(E)(3), the trial court noted that Tanner has consistently shown he lacks insight into his mental condition and that he would be unlikely to seek professional assistance as needed. The court stated that the evidence adduced at the 2021 review hearing, including Tanner's angry outburst and his continual "theory" that steroid use and stress led him to decapitate his wife, "confirms that Tanner's beliefs regarding his lack of mental illness continue to prevail." Citing Dr. O'Donnell's 2015, 2017, and 2020 reports that show Tanner's negative attitude toward most mental health

professionals and his unlikely voluntariness to engage in treatment, the trial court further noted that Tanner's demonstrated lack of insight into his mental condition has historically and continues to affect his ability to engage in treatment. The court concluded that such lack of insight negatively impacts Tanner's desire to seek professional assistance as needed. The court "ha[d] no confidence that Tanner would continue with treatment or seek professional assistance as needed should his commitment be terminated."

{¶ 44} The trial court reviewed any past history of Tanner's case for conforming to the rules of law under R.C. 2945.401(E)(5). Such history included a "1980s conviction for Failure to Pay Child Support," Tanner's 1993 use of marijuana against hospital policy when he was still psychiatrically hospitalized, and Tanner's physically aggressive relationship with his first wife and his admission to "smacking" her. The trial court found Tanner's history of violence, the lack of any signs prior to Tanner decapitating his second wife, the rapid onset of his psychosis, and his refusal to participate in treatment to be significant. Unlike in 2015, Dr. O'Donnell did not speak with Tanner's relatives when she completed her report and evaluation of Tanner in 2020. By contrast, Dr. Kukor spoke with Tanner's relatives who all indicated they watch for any signs of concerning behavior in Tanner and would seek help should a concerning behavior emerge. However, the trial court questioned whether Tanner's family would be helpful if Tanner's symptoms recurred, given the family's awareness of Tanner's decompensation in 1990 and its failure to take any action to address it, and Dr. O'Donnell's concerning reiteration in her 2020 report that Tanner is "unlikely to voluntarily participate in psychotherapy or other form of treatment."

{¶ 45} As for whether Tanner was in remission and would continue treatment to maintain the remissive state should the commitment be terminated, the trial court noted that it "continues to struggle with 'whether or not Tanner could be in remission from a disease that the experts struggled to diagnose.'" The trial court noted that despite the lack of

published research and in contrast with her 2017 testimony, Dr. O'Donnell testified during the 2021 review hearing that Tanner was in remission from an unspecified mental illness. Dr. Kukor testified Tanner was in remission but was unable to articulate or explain what accounted for the remission. Dr. Fridman, in turn, explained at the 2021 review hearing that Tanner's mental illness had gone away like the common cold. Given Tanner's concerning negative attitude toward treatment throughout the pendency of the case, and the inconsistent psychiatric testimony regarding Tanner's diagnosis and whether Tanner is in remission from some mental illness, the trial court concluded it was unable to find that Tanner's mental illness was in remission: "Indeed, the Court finds that there is no evidence to suggest why any remission occurred. Moreover, this Court has no confidence that Tanner would continue with treatment to maintain any remissive state should his commitment be terminated."

{¶ 46} By all accounts, Tanner has not reoffended or committed any violent crime, he has not used medication to control his actions, and there has been no substance abuse, no identified symptoms of mental illness, and no psychiatric symptomatology since 1996, the entire time he has been on conditional release. However, contrary to Tanner's arguments, Drs. O'Donnell, Fridman, and Kukor did not simply testify that Tanner is not a mentally ill person. Although all three psychologists recommended termination of Tanner's commitment, their reasons for supporting termination were undermined at the hearing. All three psychologists had weak as well as strong areas in their testimonies, and the trial court, as the trier of fact, was free to believe all, part, or none of the testimony of each witness. *Tanner*, 2019-Ohio-1193 at ¶ 38. Furthermore, "[t]he weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact" because the trial court was in the best position to view the witnesses, observe their demeanor, gestures and voice inflections, and use said observations in weighing the credibility of the proffered testimony.

*Id.*

{¶ 47} In 2019, we upheld Tanner's continued commitment following the 2018 biennial review hearing on the grounds that (1) mental health professionals were unable to agree on a diagnosis for Tanner, (2) there were concerns regarding Tanner's insight into his condition, (3) epidemiological data indicates that a significant percentage of persons diagnosed with or experiencing a major depressive disorder, single episode, severe with psychotic features are expected to experience a "second episode" in their lifetime, (4) mental health professionals had no explanation for the remission of Tanner's mental illness, and (5) there were concerns regarding Tanner's willingness to seek professional help or treatment should he decompensate based upon his distrust of mental health treatment and negative attitude toward most mental health professionals.

{¶ 48} With the exception of Dr. Kukor's testimony, the evidence before the trial court during the October 2021 review hearing is virtually identical to the evidence that was introduced in the 2018 biennial review hearing. Drs. O'Donnell and Fridman testified in both review hearings; Dr. Kukor testified only in the 2021 review hearing. The grounds identified above were also the basis for the trial court's most recent denial of Tanner's request to terminate his commitment and were supported by the testimony and reports of Drs. O'Donnell, Fridman, and Kukor. Furthermore, the trial court directly observed Tanner's angry and interruptive outburst when on cross-examination, the prosecutor inquired of Dr. Kukor about the semantics of using the term "index offense" instead of "murder." The incident belies Dr. O'Donnell's opinion that the expression of Tanner's alleged personality disorder "no longer creates disruptive episodes of conflict or obviously thwarting of authority."

{¶ 49} All three psychologists reported as favorable Tanner's uneventful breakup of a romantic relationship more than 12 years ago. The psychologists reported that the

- 18 -

breakup was mutual, devoid of violence and animosity, and that Tanner and his former girlfriend remained friendly. Dr. Kukor reported that this was important because one of the stressors leading up to the offense was relationship loss. However, the absence of violence or animosity in the breakup was self-reported by Tanner and none of the psychologists talked to Tanner's former girlfriend.

{¶ 50} Accordingly, after considering the evidence submitted at the hearing, the history of Tanner's illness and treatment, and the factors set forth in R.C. 2945.401(E), we find that Tanner's due process rights were not violated and that the trial court did not err in denying Tanner's motion to terminate his commitment. Through its examination of the witnesses, the state demonstrated that Tanner remains a mentally ill person subject to court order. The trial court's decision to continue Tanner's conditional release, with the requirement that Tanner see his counselor once every four months, was supported by the record. Tanner's assignment of error is, therefore, overruled.

{¶ 51} Judgment affirmed.

S. POWELL and HENDRICKSON, JJ., concur.