[Cite as *State v. Tanner*, 2025-Ohio-5689.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2024-04-051 |
| | : | <u>OPINION AND</u> |
| - vs - | | <u>JUDGMENT ENTRY</u> |
| | : | 12/22/2025 |
| RAYMOND TANNER, | : | |
| Appellant. | : | |


CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR 1990 02 0169


Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael Greer, Assistant Prosecuting Attorney, for appellee.

Michele Temmel, for appellant.


## **O P I N I O N**


**BYRNE, J.**

{¶ 1}   Appellant, Raymond Tanner, appeals the entry of the Butler County Court of Common Pleas, General Division, denying his request to terminate his commitment

and determining he remains a person with a mental illness subject to court order.[1] For the reasons that follow, we affirm the trial court's entry.

## I. Background

{¶ 2} This is now the third time Tanner appeals an order of the trial court refusing to terminate his commitment. *See State v. Tanner*, 2019-Ohio-1193 (12th Dist.) ("*Tanner I*"); *State v. Tanner*, 2022-Ohio-4224 (12th Dist.) ("*Tanner II*"). We will discuss only those procedural and background facts necessary to decide this appeal.

### A. Underlying Facts and Procedural Posture

{¶ 3} Tanner murdered and beheaded his second wife in February of 1990. He entered a plea and was found not guilty by reason of insanity later that year after being diagnosed with schizophrenia, paranoid type. As a result, Tanner was deemed a person with a mental illness subject to court order pursuant to R.C. 2945.40 and 5122.01 and institutionalized to be treated for his mental illness. Tanner's diagnosis has changed several times over the years, but in 1996 he was diagnosed with major depressive disorder, single episode, severe with psychotic features.[2] This remains the most accepted diagnosis, but there is still no consensus among the medical professionals who have evaluated Tanner over the years.

{¶ 4} Also in 1996, Tanner was conditionally released into the community and has appeared before the trial court every two years to review his mental condition as well as the terms of his release. Since then, Tanner has had no mental health setbacks and

---

1. The General Assembly replaced the term "mentally ill person" with the term "person with a mental illness" in 2022. 2022 Am. Sub. H.B. No. 281. However, there were no substantive changes to the term's definition. *See id.* While prior proceedings and briefing in this case utilized the former term, we use the current statutory term here.

2. Dr. Myron Fridman testified at Tanner's most recent review hearing that "a major distinction between schizophrenia and [the later] diagnosis is that schizophrenia doesn't get better over time. It's a chronic illness, whereas major depressive disorder remits."

- 2 -

committed no violent crimes. Over time, the trial court altered and reduced the requirements of his conditional release, but since 2011, Tanner has been required to meet with his counselor, Gene Idol, at least once every four months.

{¶ 5}   Throughout these proceedings, including the above-mentioned appeals, Tanner's legal status as a person with a mental illness subject to court order has not changed. Over the years, Tanner has regularly expressed to medical and legal professionals involved in his case his frustration that he remains subject to court order, believing his commitment could have been terminated years ago. At times, he has also expressed doubt as to whether he ever had a mental illness and frequently questions whether a large steroid injection he received for back pain, coupled with stress over the death of his and his second wife's infant child, caused him to murder and decapitate his wife.

### B.  The 2024 Review Hearing

{¶ 6}   Tanner's most recent biennial review hearing was held on February 27, 2024. Three witnesses testified: Dr. Myron Fridman, Dr. Jennifer O'Donnell, and Gene Idol. All three witnesses have worked with Tanner over the years, and Dr. Fridman and Dr. O'Donnell previously testified at Tanner's review hearings.

{¶ 7}   Dr. Fridman works at Community Behavioral Health, Inc. and also serves as the forensic monitor for the Butler County Mental Health Board. In his report and testimony, Dr. Fridman noted "[n]othing of substance" had changed since the last review hearing, including Dr. Fridman's diagnosis of major depressive disorder, single episode, severe with psychotic features.

{¶ 8}   Dr. Fridman concluded, as he has since 2018, that Tanner was no longer a person with a mental illness subject to court order. Dr. Fridman also testified that while epidemiological data suggests that at least 60 percent of individuals with major

depressive disorders, single episode, can be expected to have a second episode in their life, he believed that Tanner was at a baseline risk compared to the general population given the passage of time without any medical or legal setbacks.[3] Dr. Fridman did note, however, that Tanner continues to muse over whether steroids caused his behavior, perhaps in an attempt "to understand for himself why" he murdered his wife.

{¶ 9} Dr. O'Donnell is the director of forensic services at the Forensic Evaluation Service Center. She characterized Tanner as an "arrogant . . . [c]antankerous . . . difficult . . . [and] bombastic" individual who "has always been that way." She testified that while Tanner has had an "evolution of his willingness to acknowledge . . . [he] did something really awful . . ." he continues to attribute his crime to steroids and not to mental illness. Dr. O'Donnell would not commit to any diagnosis for Mr. Tanner, but in her most recent report, she stated, "No one seems to have explored intoxication or the potential reaction to a medication (steroids or other substances) as that science was not then very well known." Ultimately, Dr. O'Donnell maintained that she saw no evidence of mental illness in Tanner.

{¶ 10} Dr. O'Donnell recognized that Tanner had a history of subverting the efforts of mental health professionals involved in his case and is unlikely to voluntarily engage in any form of treatment if his commitment were terminated. However, Dr. O'Donnell noted that Tanner has more recently begun to express the value of periodic therapy sessions. Tanner also indicated to Dr. O'Donnell "that if he were to experience psychiatric

---

3. At the 2021 review hearing, Dr. Terrance Kukor, a forensic psychologist who conducted an independent analysis on the court's behalf, similarly testified that "about 50 percent of people affected by major depressive disorder, single episode, will have recurrent illness and that persons prone to recurrent illness will have around five lifetime episodes." *Tanner II*, 2022-Ohio-4224 at ¶ 25. He also commented in a report submitted to the court that "Tanner's 'mental illness [is] in a state of remission, and there is a high probability that he will continue to maintain this remissive state should the commitment conditions be altered.'" *Id.* at ¶ 10.

decompensation in the future, he would be likely to report the early signs to a treatment provider . . ." According to Dr. O'Donnell, Tanner stated he "enjoys" talking to Mr. Idol and Dr. Fridman."

{¶ 11} Gene Idol has been Tanner's mental health therapist and counselor for approximately 15 years. Tanner was referred to Idol by Dr. Fridman because both Idol and Tanner live in Montgomery County, Ohio, making appointments easier to schedule. Idol testified that since Tanner's previous review hearing, Idol observed no signs of mental illness or anything that would require additional therapeutic or legal intervention. Idol acknowledged, however, that he is not qualified to diagnose patients with mental illnesses or proscribe them medications. Idol testified that Tanner remained "frustrated" with therapy and does not believe he needs to be subject to any court supervision. However, Idol asserted that Tanner has grown accustomed to their sessions and adopted a "this is what it is attitude" about meeting with him.

{¶ 12} Each witness acknowledged that their opinions were almost exclusively formed by speaking only with Tanner in person or by video. None of them spoke with Tanner's family or observed Tanner during his day-to-day life.

### C. The Trial Court's Decision

{¶ 13} After the reviewing hearing, the trial court eventually issued a Journal Entry on Reviewing Hearing. Noting repeatedly that little had changed since the last conditional release hearing, the trial court refused to terminate Tanner's commitment. In doing so, the trial court considered the factors identified in R.C. 2945.401(E). First, the court determined Tanner remained a substantial risk of physical harm to himself or others— R.C. 2945.401(E)(1)—by pointing to, among other things, the swift onset of symptoms that preceded the murder, Tanner's documented frustrations with participating in treatment, and the resulting belief that Tanner would not participate in therapy unless

ordered to do so. The court also cited Dr. Fridman's testimony that individuals with Tanner's diagnosis face a high chance of experiencing another mental health episode.

{¶ 14} Turning to Tanner's current mental and physical condition—R.C. 2945.401(E)(2)—the trial court noted that medical professionals continued to provide "inconsistent psychiatric and medical testimony" as to Tanner's condition and were unable to agree on a diagnosis. As a result, the trial court was not confident that Tanner would not experience another mental health episode. The trial court further observed that Tanner continued to demonstrate a lack of insight into his mental health condition—R.C. 2945.401(E)(3)—by continuing to (1) express frustration with remaining subject to court ordered therapy, (2) appear unlikely to pursue treatment without a court order, (3) ponder the role of steroids in his wife's murder, and (4) question whether he had a mental health illness at all.

{¶ 15} Next, the trial court analyzed Tanner's history and ability to conform in society under R.C. 2945.401(E)(5).[4] The court noted that outside of the murder of his wife, Tanner's criminal history was limited to a conviction for failing to pay child support in the 1980s and for using marijuana while he was institutionalized. Tanner previously also acknowledged that his relationship with his first wife was "physically aggressive," and he admitted to "smacking" her.

{¶ 16} Despite Tanner's minimal criminal history, the trial court concluded the "sheer violence" exhibited by Tanner in murdering his wife was "'an obvious source of concern,'" especially when coupled with the sudden onset of Tanner's symptoms and past refusals to participate in therapy. The trial court's conclusions here were shaped in part by the medical opinion of Dr. Terrance Kukor, a forensic psychologist who conducted an

---

4. Regarding R.C. 2945.401(E)(4)–the grounds upon which the state relied for keeping Tanner in commitment–the court stated "The State submitted on the evidence that was presented at the hearing."

independent review of Tanner on the court's behalf before Tanner's 2021 review hearing.

{¶ 17} Finally, the court assessed whether there was evidence that Tanner's mental illness was in a state of remission under R.C. 2945.401(E)(6). The trial court stated it continued "to struggle with 'whether or not Tanner could be in remission from a disease that the experts struggled to diagnose.'" Quoting *Tanner I*, 2019-Ohio-1193 at ¶ 46, *Tanner II*, 2022-Ohio 4224 at ¶ 45. The trial court further stated that it had "no confidence that Tanner would continue with treatment to maintain any remissive state should his commitment be terminated."

{¶ 18} In light of these factors, the trial court concluded that there was clear and convincing evidence that Tanner remained a person with a mental illness subject to court order. As a result, the court denied the request to terminate his commitment.

{¶ 19} Tanner appeals this order.

## II. Law and Analysis

{¶ 20} Tanner's sole assignment of error states:

> THE TRIAL COURT ERRED TO THE PREJUDICE OF MR.
> TANNER WHEN IT FAILED TO TERMINATE MR.
> TANNER'S COMMITMENT

{¶ 21} Tanner argues that the State failed to prove by clear and convincing evidence that he remains a person with a mental illness subject to court order. Tanner also argues the trial court abused its discretion in concluding the same. In summary, Tanner asserts that (1) he is not a substantial risk to anyone as evidenced by, among other things, no instances of violent behavior for several decades, (2) the testimony of medical professionals shows his mental illness is in remission or that he no longer suffers from mental illness, and (3) Tanner's recent expression regarding the value of meeting with therapists demonstrates insight into his condition that is not undermined by "perfectly legitimate" speculation that steroids contributed to his wife's murder.

**A. Underlying Law**

{¶ 22} "Individuals in Ohio found not guilty by reason of insanity and committed to mental-health institutions are protected by both the due process clauses of the United States and Ohio Constitutions and by statute under R.C. Chapters 2945 and 5122." *Tanner II*, 2022-Ohio-4224 at ¶ 31, citing *In re Fisher*, 39 Ohio St.2d 71 (1974); *Tanner I*, 2019-Ohio-1193, ¶ 30. "The involuntary commitment of an individual constitutes a significant deprivation of liberty." *State v. Rohrer*, 2015-Ohio-5333, ¶ 21 (4th Dist.). Therefore, "it is particularly important that the statutory scheme be followed, so that the [individual's] due-process rights receive adequate protection." *In re Miller*, 63 Ohio St.3d 99, 101 (1992).

{¶ 23} Under R.C. 2945.401, Ohio's trial courts are given continuing jurisdiction over persons found not guilty by reason of insanity and committed to mental-health institutions by court order. Once committed by the court, that individual remains subject to the jurisdiction of the trial court until "either early termination of the commitment by the trial court or the expiration of the maximum prison term that could have been imposed if the person had been convicted of the most serious offense charged." *Tanner II*, at ¶ 33, citing *State v. Stutler*, 2022-Ohio-2792, ¶ 10.

{¶ 24} "Where there has been a recommendation that a defendant's commitment be terminated, the prosecutor bears the burden of proving by clear and convincing evidence that the defendant remains a [person with a mental illness] subject to court order." *Tanner I* at ¶ 38, citing R.C. 2945.401(G)(1). *See also State v. Hickman*, 2024-Ohio-5747, ¶ 35. Clear and convincing evidence is greater than "a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469

(1954), paragraph three of the syllabus. "Whether the State carried its burden is a factor to be considered by the trial court when considering whether to approve, modify, or disapprove the recommendation." *Hickman* at ¶ 35.

{¶ 25} The trial court may order the final termination of an individual's commitment if it determines the individual is no longer a person with a mental illness subject to court order. R.C. 2945.401(J)(1)(a), *Tanner II*, 2022-Ohio-4224 at ¶ 33. A "person with a mental illness subject to court order" is defined, in relevant part, as:

> a person with a mental illness who, because of the person's illness . . . [r]epresents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness[.]

R.C. 5122.01(B)(2). "Mental illness" is defined as a "substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life." R.C. 5122.01(A). Notably, "[a] person's mental condition may meet the statutory definition of 'mental illness' provided in R.C. 5122.01(A), regardless of whether his or her condition meets the clinical definition of mental illness." *State v. Sullivan*, 2001-Ohio-6, fn. 4.

### B. Trial Level Standards and Appellate Standard of Review

{¶ 26} Trial courts possess "unqualified discretion" when weighing whether to "approve, disapprove, or modify" a recommendation to terminate the commitment of a person with a mental illness. *Hickman* at ¶ 35; R.C. 2945.401(I). When doing so, the trial court must consider "all relevant factors," including those identified in R.C. 2945.401(E):

> (1) Whether, in the trial court's view, the defendant or person currently represents a substantial risk of physical harm to the defendant or person or others;
>
> (2) Psychiatric and medical testimony as to the current mental

- 9 -

and physical condition of the defendant or person;

(3) Whether the defendant or person has insight into the defendant's or person's condition so that the defendant or person will continue treatment as prescribed or seek professional assistance as needed;

(4) The grounds upon which the state relies for the proposed commitment;

(5) Any past history that is relevant to establish the defendant's or person's degree of conformity to the laws, rules, regulations, and values of society; [and]

(6) If there is evidence that the defendant's or person's mental illness is in a state of remission, the medically suggested cause and degree of the remission and the probability that the defendant or person will continue treatment to maintain the remissive state of the defendant's or person's illness should the defendant's or person's commitment conditions be altered.

{¶ 27} Appellate courts review the trial court's decision in these proceedings for an abuse of discretion. *Hickman* at ¶ 32. An abuse of discretion occurs when the trial court is "unreasonable, arbitrary[,] . . . unconscionable" and "did not engage in a sound reasoning process." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983), (cleaned up) *Hickman*, at ¶32.

### C. Analysis

{¶ 28} We again conclude that (1) clear and convincing evidence was presented by the State demonstrating that Tanner remains a person with a mental illness subject to court order, and (2) the trial court did not abuse its discretion in denying Tanner's request to terminate his commitment. As noted by Dr. Fridman and the trial court, "nothing of substance" has changed since the last review hearing. Nonetheless, the trial court's order parsed the voluminous factual and procedural history of this case and thoroughly analyzed the factors identified in R.C. 2945.401(E).

{¶ 29} After reviewing the record and the trial court's findings, we acknowledge—

as we did in 2019 and in 2022—that Tanner "has not reoffended or committed any violent crime . . . has not used medication to control his actions, and there has been no substance abuse, no identified symptoms of mental illness, and no psychiatric symptomatology since 1996, the entire time he has been on conditional release." *Tanner II*, 2022-Ohio-4224 at ¶ 46.

{¶ 30} However, it also remains true, as in 2019 and in 2022, that:

> (1) mental health professionals [are] unable to agree on a diagnosis for Tanner, (2) there [are] concerns regarding Tanner's insight into his condition [due to his continuing fixation on steroids as a cause of the murder], (3) epidemiological data indicates that a significant percentage of persons diagnosed with or experiencing a major depressive disorder, single episode, severe with psychotic features are expected to experience a "second episode" in their lifetime, (4) mental health professionals had no explanation for the remission of Tanner's mental illness, and (5) there were concerns regarding Tanner's willingness to seek professional help or treatment should he decompensate based upon his distrust of mental health treatment and negative attitude toward most mental health professionals.

*Id.* at ¶ 47. Perhaps the only circumstances that have changed since Tanner's last hearing are Dr. O'Donnell's opinion that Tanner has grown slightly more amenable to or may even "enjoy" his court ordered appointments and his opinion that Tanner may in fact have experienced "roid rage" when he killed his wife.

{¶ 31} However, we find no abuse of discretion that the trial court—as the trier of fact—gave little weight to either of these circumstances. Neither Dr. O'Donnell's opinion nor what Idol perhaps more accurately characterized as Tanner's current "this is what it is attitude" to the requirements of his commitment do not eliminate Tanner's longstanding frustration with or outright defiance of court ordered therapy. Despite not committing any violent crime for over thirty years, Tanner has continued not to meaningfully engage with

mental health professionals—or himself—to acknowledge and understand what caused him to brutally murder and behead his wife in 1990. Dr. O'Donnell's inconclusive thoughts regarding the possibility that Tanner experienced "roid rage" not only encourages his focus on this theory to the exclusion of other perspectives and insights into his condition, but adds to the medical uncertainties of Tanner's mental condition.

{¶ 32} Ultimately, it is little wonder to this court how Tanner's ongoing apathy (or hostility) to therapy, his blame shifting, and the medical uncertainty regarding his diagnosis did not sufficiently allay the trial court's concern that Tanner could be "set off" again if left entirely to his own devices. *State v. Hickman*, 2024-Ohio-5747, ¶ 36. Therefore, while Dr. Fridman, Dr. O'Donnell, and Idol all believe that, medically speaking, Tanner no longer has a mental illness and can be released from commitment, we conclude that the trial court did not abuse its discretion in making the separate legal conclusion that Tanner remains a person with a mental illness subject to court order.

{¶ 33} Judgment affirmed.

HENDRICKSON, P.J., and M. POWELL, J., concur.

## J U D G M E N T   E N T R Y

The assignment of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Butler County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Mike Powell, Judge

/s/ Matthew R. Byrne, Judge