[Cite as *State v. Dhimal*, 2026-Ohio-1805.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2025-07-079 |
| vs. | : | OPINION AND JUDGMENT ENTRY 5/18/2026 |
| ACHYUT DHIMAL, | : | |
| Appellant. | : | |
| | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2024-02-0297

Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael Greer, Assistant Prosecuting Attorney, for appellee.

Christopher Bazeley, for appellant.

**O P I N I O N**

**BYRNE, P.J.**

{¶ 1} In a criminal case, the Butler County Court of Common Pleas, General Division, determined that Achyut Dhimal was incompetent to stand trial, was not likely to be restored to competency, had committed the offenses of burglary and kidnapping, and

was a person with a mental illness subject to court order. The court therefore issued an order retaining jurisdiction over him under R.C. 2945.39. Dhimal appeals from that order, arguing that there was insufficient evidence for the court to determine that he possessed the mens rea necessary to prove burglary and kidnapping. For the reasons stated below, we affirm.

## I. Facts and Procedural Background

### A. Indictment, Plea, and Initial Competency Proceedings

{¶ 2}   On March 4, 2024, the Butler County Grand Jury returned an indictment charging Dhimal with four counts as described below:

| Counts | Offense | Revised Code Section | Offense Level |
|---|---|---|---|
| 1 | Burglary | R.C. 2911.12(A)(1) | F2 |
| 2 | Kidnapping | R.C. 2905.01(A)(4) | F1 |
| 3 | Abduction | R.C. 2905.02(B) | F3 |
| 4 | Gross Sexual Imposition | R.C. 2907.05(A)(1) | F4 |

{¶ 3}   The indictment stemmed from events that occurred on February 26, 2024. Early that morning, Dhimal allegedly broke into a family's home, entered the bedroom of a female minor child ("Melissa"), and restrained her against her will.[1]

{¶ 4}   Dhimal pleaded not guilty by reason of insanity and suggested that he was incompetent to stand trial. As a result, the common pleas court ordered forensic evaluations of Dhimal. The court later found Dhimal incompetent to stand trial.[2] The court ordered Dhimal to undergo treatment for up to a year to restore competency, pursuant to

---

1. We use a pseudonym for purposes of protecting the minor child's identity and for improving the readability of the opinion. *See The Supreme Court of Ohio Writing Manual*, § 16, at 115 (3d Ed. 2024).

2. We need not discuss the evidence that supported the common pleas court's finding of incompetency because that determination is not challenged in this appeal. We note, however, that among other evidence supporting the incompetency determination, there was evidence that Dhimal has schizophrenia disorder, the bipolar type.

R.C. 2945.38.[3] That statute authorizes common pleas courts to require a defendant charged with a first- or second-degree felony to undergo treatment for up to one year if there is a "substantial probability" that, with treatment, the defendant will be restored to competency. R.C. 2945.38(B)(1)(a)(i), (C)(1); *State v. Hopkins*, 2023-Ohio-2816, ¶ 7 (12th Dist.).

{¶ 5}   Almost a year later, the common pleas court conducted a competency review hearing. The next day, the court issued an entry finding that Dhimal had been restored to competency and could stand trial. But following another review hearing held almost two months later, the court ordered Dhimal to be reevaluated for competency.

{¶ 6}   In anticipation of the court again finding Dhimal to be incompetent, the state filed a motion asking the court to retain jurisdiction of Dhimal pursuant to R.C. 2945.39(A)(2). That statute provides that "[i]f the one-year period [in R.C. 2945.38] expires and the defendant remains incompetent to stand trial . . . the prosecuting attorney can request that the court retain jurisdiction over the defendant." *Hopkins* at ¶ 7, citing R.C. 2945.39(A)(2). The consequences of a determination to "retain jurisdiction" are explained further in the analysis section of this opinion.

{¶ 7}   The common pleas court found during a competency hearing that Dhimal was again incompetent to stand trial and that he was "not restorable within the time allotted by law" (presumedly referring to the above-described one-year period under R.C. 2945.38). The court scheduled a hearing on the state's R.C. 2945.39 motion for the court to retain jurisdiction of Dhimal.

---

3. R.C. 2945.38, 2945.39 and 2945.401, all at issue in this appeal, were amended effective February 20, 2026, while this appeal was pending. The common pleas court's order was issued in June 2025. As such, we apply the versions of R.C. 2945.38, 2945.39, and 2945.401 in effect at the time of the trial court's order, not the versions of the statutes now in effect. *See State v. Bowman*, 2023-Ohio-2818, ¶ 20 (12th Dist.).

**B. Hearing on Motion for Court to Retain Jurisdiction**

{¶ 8}   Over the course of two days in June 2025, the common pleas court held a hearing on the state's motion for the court to retain jurisdiction of Dhimal. The state presented four witnesses: Melissa, two City of Monroe police officers, and Melissa's mother's boyfriend ("Mother's Boyfriend"). Dhimal did not present any witnesses. We will summarize the relevant testimony below.

**1. Melissa's Testimony**

{¶ 9}   At the hearing, Melissa testified that she lived in a house with her younger brother, her mother ("Mother"), and Mother's Boyfriend. Melissa testified that her bedroom was in the basement of the house. On the night in question, her brother invited a few friends to sleep over. Around 3:00 a.m., she "w[oke] up and [saw] somebody in [her] room," and assumed it was her brother or one of his friends. But when the person turned toward her, she did not recognize him and realized he closed her bedroom door. She testified that she was "freaking out," but that she waited to scream because she "didn't know this man" in her room, "didn't know if he had weapons," and "didn't know what his intentions were." At the hearing, Melissa identified Dhimal as the man who was in her bedroom that night.

{¶ 10}  Melissa further testified that Dhimal "walked over to [her]," entered her bed, and "got on top of [her]." While he was on top of her, they were "face-to-face," and he grabbed both of her wrists and held them up to her pillow. Melissa testified that she could not remember how they both got up from her bed, but when they did, she started hitting Dhimal's face, his arms, and "everything to get him off of [her]."

{¶ 11}  Melissa testified that she moved towards her bedroom door while trying to repel Dhimal. But Dhimal began to pull her back toward her bed. He was "holding [her] arm back and holding [her] arms together." Dhimal also put his hand over her mouth.

{¶ 12} Melissa testified that when they got close to her bedroom door, Dhimal fell to the ground. This caused Melissa to fall on top of him within the doorway. (When cross-examined, Melissa explained that as Dhimal fell, she opened the bedroom door.) She testified that she then straddled Dhimal around his belt and stomach area to hold him down and called 911. She further testified that as she held him down, she started screaming while twisting Dhimal's nose and punching his face. She testified that she obtained bruises on both of her knees from falling to the ground and from their fight.

{¶ 13} Melissa testified that as she was straddling Dhimal to hold him down, he lifted her sweatshirt and touched her breasts. She was not wearing anything under her sweatshirt, and she recollected that while she was straddling him, he began thrusting his hips up and down and stated, "let me fuck you."[4]

{¶ 14} Melissa testified that Mother and Melissa's brother came downstairs to her bedroom in the basement when they heard her screams. When they came downstairs, Melissa's mother turned on the bedroom light and held Dhimal down. Melissa then fled upstairs to tell Mother's Boyfriend "to get the gun."

{¶ 15} Melissa further testified that when she went upstairs, she noticed that Dhimal brought a "Ziploc bag full of stuff" into the house, and she saw the family's drill sitting next to Dhimal's shoes near the garage door.

## 2. Police Testimony

{¶ 16} After Melissa's testimony, the state called a City of Monroe police officer, Sergeant Adam Binder, to testify. Sergeant Binder stated that he responded to a call and arrived around 2:00 a.m. to stop an "active burglary." Upon his arrival, he was responsible for finding Dhimal's place of entry into the house. Sergeant Binder stated that the only

---

4. In the written police report that Melissa gave to the police, she stated that the defendant said, "let me fuck" instead of "let me fuck you."

place where Dhimal could have entered the house was through the garage door, which was opened that night by "approximately two feet." Sergeant Binder testified that later that morning, when he questioned Dhimal in his police car, Dhimal admitted to entering the house through the partially-opened garage door. Sergeant Binder also testified that Mother's Boyfriend indicated that Dhimal took his shoes off and placed them inside the dining room, near the laundry room, when he entered the house.

{¶ 17} Another City of Monroe police officer, Zachary Baxter, also testified at the hearing. He testified that he questioned Dhimal at the scene and asked him why he went into the home. Dhimal told him that his brother lived a few doors down and that no one would open the front door at the house, so he decided to go under the garage door to go into the house.

### 3. Mother's Boyfriend's Testimony

{¶ 18} Mother's Boyfriend also testified at the hearing. He stated that on the night in question, he left the garage door slightly open so that the cat could sleep inside. He added that the garage door of the house leads to the laundry room, and that the garage door was "typically locked" but sometimes was "left unlocked."

{¶ 19} Mother's Boyfriend also testified that the family's house has a security system that included cameras. The security footage from the night Dhimal entered the house showed Dhimal on the porch near the front door at around 1:55 a.m. He also testified that the security system notified him that at 2:23 a.m. that morning, their garage door opened. He testified that he identified "a pair of shoes, a backpack, and a drill and a charger from [his] garage sitting on [his] kitchen table." The drill and charger were from the garage, but the backpack was not Mother's Boyfriend's. His tools in the garage looked as though they were rummaged through.

**4. Closing Arguments**

{¶ 20} During closing arguments, Dhimal's counsel agreed that the state identified Dhimal as the defendant and admitted to Dhimal committing the physical acts of burglary and kidnapping (the "actus reus," as discussed below). However, Dhimal's counsel disagreed with the state's contention that it presented sufficient evidence that Dhimal acted with the mental state (the "mens rea," as discussed below) of purpose necessary to prove burglary and kidnapping.

**5. Common Pleas Court's Factual Findings**

{¶ 21} At the hearing, after both parties presented their closing arguments, the common pleas court orally stated its factual findings. The court found that on February 26, 2024, Dhimal committed the offenses of burglary in violation of R.C. 2911.12(A)(1) and kidnapping in violation of 2905.01(A)(4).[5] The court also found that Dhimal was a person with a mental illness pursuant to R.C. 2945.39.[6]

{¶ 22} As to the burglary offense, the court found that Dhimal entered the home through the garage door, and that he did not have permission [to] enter the house. The court also recognized that Dhimal "clearly developed the intent to commit multiple criminal offenses while trespassing inside" the home. The court explained that once Dhimal entered the garage, he "took a drill out of a box and entered the home, setting it next to some of his own items" and "proceeded to the basement." The court also found that Dhimal entered Melissa's room, closed the door, lay on top of her on the bed and "grabbed

---

5. Count 3 (abduction) and Count 4 (gross sexual imposition) were charged as felonies of the third and fourth degree, respectively. Those charges do not fall within the list of offenses described in R.C. 2945.38(C)(1). As a result, Counts 3 and 4 were not considered in the court's review of the state's motion to retain jurisdiction, and are not at issue in this appeal.

6. The common pleas court and the relevant statutes alternatingly use the phrases "person with a mental illness" and "mentally ill person." These phrases are synonymous.

and restrained her hands near her head." The court also found that as Melissa attempted to leave her bedroom, Dhimal "further restrained her" by "pulling her arm back away from the door, and ultimately, using her arms to restrain her by wrapping her arms around herself and hugging her." The court found that Dhimal caused Melissa to fall, which resulted in bruising.

{¶ 23} As to the kidnapping offense, the common pleas court found that Dhimal's restraint of Melissa "was for the purpose of engaging in sexual activity against [Melissa's] will." The court determined that Dhimal had the purpose of engaging in sexual contact with Melissa because he entered Melissa's room, shut the door, "climbed onto [Melissa's] bed," "laid himself on top of [Melissa], and held her arms down." The court also found that Dhimal continued to try to hold Melissa down and tried to restrain her when they were up from Melissa's bed. The court found that Dhimal lifted her "sweatshirt up, touched her breasts on her skin, and lifted his hips up off the ground, saying, let me fuck" which revealed his purpose to engage in sexual activity with Melissa.

{¶ 24} Consequently, finding that the elements of R.C. 2945.39 were met, the court orally granted the state's motion for the court to retain jurisdiction over Dhimal and stated that the court would admit Dhimal to "Summit Behavioral Health for up to 11 years."

### C. Written Order and Dhimal's Appeal

{¶ 25} A few days after the hearing, the common pleas court issued a written order granting the state's motion to retain jurisdiction over Dhimal. The court found "by clear and convincing evidence," pursuant to R.C. 2945.39, that Dhimal committed burglary and kidnapping. The court also found that Dhimal was "a mentally ill person subject to court order," that Dhimal was "a danger to himself and others," and that Dhimal's admission to "Summit Behavioral Health [was] the least restrictive alternative available that [was] consistent with public safety and the welfare of [Dhimal]."

{¶ 26} Dhimal appealed, raising two assignments of error.

## II. Law and Analysis

{¶ 27} Dhimal's first assignment of error states:

> THE TRIAL COURT'S FINDINGS THAT DHIMAL ACTED WITH THE REQUISITE INTENT TO COMMIT KIDNAPPING AND BURGLARY IS BASED UPON INSUFFICIENT EVIDENCE.

{¶ 28} In support of his first assignment of error, Dhimal argues that the common pleas court erred in retaining jurisdiction over him because there was insufficient evidence to show that he acted with the statutorily-required mens rea of "purpose" to commit the offenses of burglary and kidnapping.

### A. Background Law and Standard of Review

{¶ 29} Dhimal's first assignment of error concerns the common pleas court's application of a particular statute, R.C. 2945.39. That statute applies to criminal defendants who meet three threshold criteria. First, the defendant must be "charged with an offense described in division (C)(1) of section 2945.38 of the Revised Code." R.C. 2945.39(A). Second, the defendant must be one who "is found incompetent to stand trial." *Id.* Third, *either* "the maximum time for treatment" as specified in R.C. 2945.38(C) must have expired, *or* the court must have found "that there is not a substantial probability that the defendant will become competent to stand trial even if the defendant is provided with a course of treatment." R.C. 2945.39(A). The parties do not dispute that Dhimal met these requirements and therefore, they are not at issue in this appeal.

{¶ 30} With regard to such a defendant, R.C. 2945.39 provides two options.

{¶ 31} First, the statute provides that a court or prosecutor may seek civil commitment of the defendant through a probate court action. R.C. 2945.39(A)(1). This civil commitment option was not pursued in this case and is not at issue in this appeal.

- 9 -

{¶ 32} Second, the statute provides that the court may "retain jurisdiction" of such a defendant. R.C. 2945.39(A)(2). The specific requirements are as follows:

On the motion of the prosecutor or on its own motion, the court may retain jurisdiction over the defendant if, at a hearing, the court finds both of the following by clear and convincing evidence:

(a) The defendant committed the offense with which the defendant is charged.

(b) The defendant is a person with a mental illness subject to court order or a person with an intellectual disability subject to institutionalization by court order.

R.C. 2945.39(A)(2).

{¶ 33} If a court, as here, finds that these criteria are satisfied with respect to a defendant, the court "shall commit the defendant . . . either to the department of mental health and addiction services for treatment at a hospital, facility, or agency as determined clinically appropriate by the department . . . or to another medical or psychiatric facility, as appropriate." R.C. 2945.39(D)(1). The defendant must remain in such treatment for a maximum period of time determined by statute. R.C. 2945.401(J)(1). If the defendant is restored to competency within that maximum period of time, the defendant may then be tried for the charged offenses falling within R.C. 2945.38(C)(1). R.C. 2945.401(J)(2)(a).

{¶ 34} "Clear and convincing evidence is greater than a mere preponderance of the evidence, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Cleaned up.) *State v. Tanner*, 2025-Ohio-5689, ¶ 24 (12th Dist.).

{¶ 35} Though R.C. 2945.39 concerns criminal defendants, the Ohio Supreme Court has characterized R.C. 2945.39 as civil in nature, and not punitive or criminal. *State*

*v. Williams*, 2010-Ohio-2453, ¶ 33, 35. "[I]n civil cases, as in criminal cases, the sufficiency of the evidence is quantitatively and qualitatively different from the weight of the evidence." *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 23. "'[S]ufficiency is a test of adequacy'" while the manifest weight of the evidence "'relates to persuasion.'" *Id.* at ¶ 11, 19, quoting *State v. Thompkins*, 78 Ohio St.3d 80, 386 (1997). Sufficiency is also a "'question of law.'" *Id.* at ¶ 11, quoting *Thompkins* at 386. "When reviewing the sufficiency of the evidence in civil cases, the question is whether, after viewing the evidence in a light most favorable to the prevailing party, the judgment is supported by competent, credible evidence." *Krzywicki v. Galletti*, 2015-Ohio-312, ¶ 32 (8th Dist.), citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280 (1978); *see also Morris v. Gedraitis*, 2023-Ohio-2317, ¶ 75 (5th Dist.), citing *Moran v. Gaskella*, 2012-Ohio-1158, ¶ 12 (5th Dist.).

**B. Analysis**

{¶ 36} As stated above, to retain jurisdiction over a criminal defendant, a common pleas court must make the two factual findings described in R.C. 2945.39(A)(2)(a) and (b) by clear and convincing evidence. Here, Dhimal does not challenge the court's R.C. 2945.39(A)(2)(b) finding that he was a person with a mental illness subject to court order. Rather, he challenges the court's R.C. 2945.39(A)(2)(a) finding that he committed the burglary and kidnapping offenses with which he was charged.

{¶ 37} In Ohio, a defendant typically is not liable for a criminal offense unless the defendant both (1) "performs the conduct" prohibited by the criminal offense statute and (2) "has the requisite degree of culpability for each element as to which a culpable mental state is specified by the section defining the offense." R.C. 2901.21(A)(1)-(2). Ohio courts have traditionally referred to the conduct requirement as the "actus reus" and to the mental culpability requirement as the "mens rea." *State v. Cargile*, 2009-Ohio-4939, ¶ 8-10; *Akron v. Peoples*, 2011-Ohio-579, ¶ 9 (9th Dist.).

{¶ 38} In challenging the common pleas court's R.C. 2945.39(A)(2)(a) finding, Dhimal does not dispute that he performed the *conduct* that is required to prove burglary and kidnapping—that is, the "actus reus." Instead, he argues the record does not contain sufficient evidence to support a finding by clear and convincing evidence that he possessed the required mens rea of "purpose" for both offenses. As Dhimal puts it:

> the issue this court must resolve is not whether Dhimal committed any criminal offenses while inside the home. Rather, the issue is whether the record shows that he manifested the requisite "purpose" to support a conviction for a felony two Burglary or felony one Kidnapping that would justify the trial court retaining jurisdiction under R.C. 2945.39.

### 1. Was the common pleas court required to find mens rea?

{¶ 39} Before addressing the merits of Dhimal's argument, we first turn to a threshold argument raised by the state. The state, noting that R.C. 2945.39 is civil in nature, argues that the common pleas court was not required to find the mens rea element of burglary or kidnapping when it conducted its R.C. 2945.39 analysis. If correct, the state's argument that the court was not required to find the mens rea element would render moot Dhimal's argument that the state failed to provide sufficient evidence of the mens rea element. The state relies on two cases.

{¶ 40} First, the state cites *State v. Sims*, 2022-Ohio-3365 (3d Dist.), which we may consider as persuasive, but is not binding on this court. In *Sims*, the Third District Court of Appeals held that a trial court did not err in finding that a defendant committed the crimes with which he was charged (attempted rape, aggravated burglary, and kidnapping) and that he was a mentally ill person subject to court order. *Id.* at ¶ 45, 50. In doing so, the Third District concluded that the mens rea element of a criminal offense is not relevant to an R.C. 2945.39(A)(2) analysis. *Id.* at ¶ 61. The court reasoned:

> contrary to any argument raised by Sims, the State was not

required to present clear and convincing evidence that Sims acted with the requisite mens rea. Indeed, "[a] trial court's determination by clear and convincing evidence under R.C. 2945.39(A)(2) that the defendant committed the offense does *not* require a finding of scienter and is merely a factor considered in determining the propriety of the commitment; it plays no role beyond that limited purpose." (Emphasis added.) [*State v.*] *Williams*, 126 Ohio St. 3d 65, 2010-Ohio-2453, at ¶ 33. "Instead, a trial court's finding under this evidentiary standard that the defendant has committed the offense charged is used only to determine the defendant's degree of dangerousness." *Id.* at ¶ 60.

*Sims* at ¶ 61. This language squarely supports the state's argument. But, notably, the Third District in *Sims* engaged in no analysis whatsoever of the text of R.C. 2945.39(A)(2). That is, the Third District did not explain why R.C. 2945.39(A)(2)(a) states that the court must find that the defendant committed "the offense," and yet it concluded that a court need not find the mens rea element of "the offense" when there is no such indication in the statute's text. Instead, the Third District based its conclusion entirely on certain language in an Ohio Supreme Court decision, *State v. Williams*, 2010-Ohio-2453. *Williams* is also the second case relied on by the state in its argument before us.

{¶ 41} In *Williams*, the Ohio Supreme Court stated—as quoted in *Sims*—that "[a] trial court's determination by clear and convincing evidence under R.C. 2945.39(A)(2) that the defendant committed the offense does not require a finding of scienter and is merely a factor considered in determining the propriety of the commitment; it plays no role beyond that limited purpose." *Id.* at ¶ 33. We find the *Sims* court's reliance on *Williams* to be misplaced. While the *holding* of *Williams* is controlling authority for this court, the portions of *Williams* on which *Sims* relied are mere dicta and thus not controlling. *See State v. Snapp*, 2025-Ohio-5276, ¶ 21 (12th Dist.), citing *State v. Sallis*, 2020-Ohio-3924, ¶ 17 (12th Dist.) ("'Dicta' refers to expressions in an opinion that go beyond the facts necessary to resolve the issues at hand and are therefore not binding in subsequent cases as legal

- 13 -

precedent."). This is the case because the question before the Ohio Supreme Court in *Williams* was not whether mens rea is relevant to a court's R.C. 2945.39(A)(2) analysis, *but* whether an R.C. 2945.39 commitment is criminal or civil in nature, and, if criminal, whether the defendant in that case was not afforded appropriate constitutional safeguards.[7] *Id.* at ¶ 21-37. Therefore, the Ohio Supreme Court's statement that an R.C. 2945.39 determination "does not require a finding of scienter," was a mere observation of the court in the course of its analysis of whether the statute was criminal or civil in nature—not the court's holding. *Id.* at ¶ 33, 66. And, as in *Sims*, *Williams* did not explain the textual basis for this observation, but merely referred to the observation of the United States Supreme Court that scienter requirements are typically associated with criminal statutes, not civil statutes. *Williams* at ¶ 32, citing *Kansas v. Hendricks*, 521 U.S. 346, 362 (1997).

{¶ 42} Thus, given the lack of any basis in the text of R.C. 2945.39 for the state's argument that the mens rea of an "offense" may be ignored in conducting an analysis of whether an "offense" was committed for purposes of that statute, we find the state's argument unpersuasive. We will therefore conduct our review of the common pleas court's finding under R.C. 2945.39(A)(2)(a) with the understanding that the court was *required* to find the mens rea of the offense. There may be valid policy reasons why mens rea should not be considered in an R.C. 2945.39(A)(2) analysis. But if this is the case, it is incumbent on the General Assembly to say so in the statute's text. *See TWISM Ents., L.L.C., v. State Bd. of Registration of Professional Engineers & Surveyor*s, 2022-Ohio-4677, ¶ 33 ("It is the province of the courts only to construe and apply statutes.").

---

7. In *Williams*, the Ohio Supreme Court held (1) that "an involuntary commitment under R.C. 2945.39 does not violate principles of equal protection or due process," and (2) that "R.C. 2945.39 is civil in nature," so "a person committed under the statute need not be afforded the constitutional rights afforded to a defendant in a criminal prosecution." *Williams* at syllabus.

### 2. What is the applicable mens rea?

{¶ 43} Turning to the merits of Dhimal's argument, he is correct that the offenses of burglary and kidnapping include the mens rea element of purpose.

{¶ 44} The burglary statute provides that "[n]o person, by force, stealth, or deception, shall . . . [t]respass in an occupied structure . . . *with the purpose to commit . . . any criminal offense*." (Emphasis added.) R.C. 2911.12(A)(1).

{¶ 45} As relevant here, the kidnapping statute provides that, "[n]o person, by force, threat, or deception . . . shall remove another from the place where the other person is found or restrain the liberty of the other person, *for any of the following purposes . . . [t]o engage in sexual activity . . . with the victim against the victim's will*." (Emphasis added.) R.C. 2905.01(A)(4).

{¶ 46} On their face, the burglary and kidnapping statutes both include the mens rea of "purpose."

{¶ 47} "A person acts purposely when it is the person's specific intention to cause a certain result . . ." R.C. 2901.22(A). To determine whether a person acted with the requisite mental state, a court can look at the "totality of circumstances surrounding" an incident. *State v. Johnson*, 56 Ohio St.2d 35, 38 (1978).

### 3. Was there sufficient evidence to prove the mens rea of purpose?

{¶ 48} The common pleas court found that Dhimal acted with the mens rea of purpose in committing the offenses of burglary and kidnapping. We find there was sufficient evidence to support both findings.

{¶ 49} As to burglary, there was evidence presented that Dhimal entered the home without permission through the partially open garage door, removed his shoes to move stealthily through the home, and took the residents' power drill and a charger and placed them next to his shoes as if he intended to take them for his own. Further, there was

evidence that Dhimal went into Melissa's room without permission, restrained her against her will, and thrusted his hips onto her, stating, "let me fuck." These actions evidence Dhimal's intent to engage in criminal, non-consensual sexual conduct with Melissa. Under the totality of the circumstances, these actions provide sufficient evidence of Dhimal's "purpose to commit . . . [a] criminal offense," namely, theft and a sexual offense such as gross sexual imposition. R.C. 2911.12(A)(1). Thus, there was sufficient evidence for the common pleas court to determine that Dhimal committed the offense of burglary. *Id.*

{¶ 50} As to kidnapping, there was evidence presented that Dhimal went into Melissa's room, closed the door, entered her bed, placed himself on top of her, restrained her wrists, and later thrusted his hips onto her while stating "let me fuck." This evidence was sufficient to prove that Dhimal restrained Melissa and intended to engage in sexual conduct with her. Therefore, under the totality of the circumstances there was sufficient evidence for the common pleas court to determine that Dhimal acted with the purpose of engaging in sexual activity with Melissa against her will and thus committed the offense of kidnapping. R.C. 2905.01(A)(4).

{¶ 51} Dhimal suggests that his mental state at the time of the offenses prevented him from forming the requisite mens rea. He states that "the more likely scenario" is that his brother told him to enter the home and he "then wandered around the house in a delusional state and reacted, rather than forming a purpose to act, to the things and people he encountered." There are several problems with this argument. First, when the evidence is viewed in favor of the state (as it must be in a sufficiency analysis), the evidence suggests the contrary—that is, that Dhimal acted with the purpose to commit crimes in the home and with the purpose to engage in sexual activity with Melissa against her will. *Krzywicki*, 2015-Ohio-312, at ¶ 32 (8th Dist.); *Morris*, 2023-Ohio-2317, at ¶ 75 (5th Dist.). Second, Dhimal essentially asks us to reweigh the evidence, but that is not

appropriate in a sufficiency analysis. *Eastley*, 2012-Ohio-2179, at ¶ 10. Third, to the extent Dhimal is making a diminished capacity argument, the defense of diminished capacity is not recognized in Ohio. *State v. West*, 2022-Ohio-2095, ¶ 12 (12th Dist.).

**4. State presented sufficient evidence to prove the mens rea of "purpose"**

{¶ 52} The common pleas court did not err in retaining jurisdiction over Dhimal based on its finding that he committed the offenses of burglary and kidnapping. There was sufficient evidence before the court to prove that Dhimal acted with the mens rea of purpose required to commit burglary and kidnapping. Therefore, we overrule Dhimal's first assignment of error.

**C. Length of Retained Jurisdiction and Common Pleas Court's Order**

{¶ 53} Dhimal's second assignment of error states:

> THE TRIAL COURT ERRED WHEN IT FAILED TO STATE THE TERM OF DHIMAL'S CONFINEMENT IN ITS [ORDER].[8]

{¶ 54} In support of his second assignment of error, Dhimal argues that the common pleas court erred when it failed to state, in its order retaining jurisdiction, the maximum number of years that it could retain jurisdiction over him. Dhimal argues that the court's failure to state in its order that it could retain jurisdiction over him for a maximum of 11 years would cause "mental health agencies and other interested parties" to not be "formally . . . placed on notice of the term [Dhimal] [would] be confined." Consequently, Dhimal asks this court to remand this case to the common pleas court to administer a nunc pro tunc entry publishing the maximum term of his commitment in the court's order. *See State v. Rarden*, 2025-Ohio-5798, ¶ 17, fn. 1 (12th Dist.) ("Nunc pro tunc entries are limited to correcting errors in judgment entries to reflect what was decided

---

8. We correct Dhimal's second assignment of error to state "order" instead of "entry" as "order" is the correct term.

at a hearing, not what the court should have or intended to decide.").

{¶ 55} Dhimal does not point to any statute or rule that specifies that the common pleas court was *required* to include the maximum term of his commitment in its order. In his brief, he only cites to a Sixth District Court of Appeals opinion in which the appeals court held that "[a] nunc pro tunc entry . . . [was] the appropriate means for the trial court to correct [its] omission." *State v. Sykes*, 2017-Ohio-1228, ¶ 13 (6th Dist.).

{¶ 56} Dhimal does not present any argument on why this court should follow *Sykes*, but only notes that the court remanded the case for the trial court to publish a nunc pro tunc entry. We emphasize that an appellate court will not "'create arguments on behalf of an appellant because it is not the duty of an Ohio appellate court to raise arguments for the parties.'" *Mallikarjunaiah v. Shankar*, 2020-Ohio-4508, ¶ 25 (12th Dist.), quoting *Dudley v. Dudley*, 2019-Ohio-4309, ¶ 10 (12th Dist.). Further, we see no reason why *Sykes* would apply in this case.

{¶ 57} Even if Dhimal pointed to any relevant statute (perhaps R.C. 2945.39 or R.C. 2945.401), we find no language requiring the maximum date for the termination of the common pleas court's retention of jurisdiction to be included in its order. It may be beneficial and a best practice for the court to include this information in its order, but we find the court here did not err in omitting information it was not required to include.

{¶ 58} But even if we were to find that the common pleas court erred in not stating Dhimal's maximum confinement term in the court's order, which we do not, any such error would be harmless. Crim.R. 52(A) states that, "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." The court failing to state the maximum number of years the court could retain Dhimal in confinement in its order does not affect a substantial right.

{¶ 59} Accordingly, we overrule Dhimal's second assignment of error.

**III. Conclusion**

**{¶ 60}** Having found both of Dhimal's assignments of error to lack merit, we overrule both.

**{¶ 61}** Judgment affirmed.

PIPER and M. POWELL, JJ., concur.

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Butler County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

*/s/ Matthew R. Byrne, Presiding Judge*

*/s/ Robin N. Piper, Judge*

*/s/ Mike Powell, Judge*